**FILMLINE (CROSS–COUNTRY) PRODUCTIONS, INC. and Yellowbill Finance Limited, Plaintiffs,**

v.

**UNITED ARTISTS CORPORATION, Defendant.**

**No. 83 Civ. 744 (JES).**

United States District Court, S.D. New York.

June 12, 1987.

As Amended June 22, 1987.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs; Robert S. Smith, Anne Louise Oates, Pamela M. Parker, of counsel.

Shea & Gould, New York City, for defendant; Martin I. Shelton, Fran M. Jacobs, of counsel.

## OPINION & ORDER

SPRIZZO, District Judge:

Plaintiffs, Filmline Productions, Inc. ("Filmline") and Yellowbill Finance Limited ("Yellowbill"), bring this action against the defendant, United Artists Corporation ("UA"), for breach of contract. Specifically, plaintiffs allege that UA wrongfully repudiated its contractual obligation to purchase and distribute a motion picture produced by Filmline. Plaintiffs seek $2,504,-508 in damages plus pre-judgment interest. See Joint Pre-Trial Order ("PTO") at ¶¶ 4, 6(n).

In April of 1984 the Court held a five-day bench trial in this action. Subsequently, the parties submitted post-trial briefs to the Court and the Court heard argument with respect to the liability issues raised at trial. On June 22, 1984 the Court orally stated its findings of facts and conclusions of law with respect to the defendant's liability in accordance with Fed.R.Civ.P. 52. See June 22, 1984 Transcript ("Opinion Tr.") at 70–78. In its oral Opinion, the Court found that the defendant was liable to the plaintiffs for breach of contract.

When the Court thereafter focused on the issue of damages, the defendant raised arguments with respect to plaintiffs' damages which the parties had not previously briefed or otherwise raised with the Court. To allow both parties the opportunity to present all evidence relevant to these new arguments, the Court reopened the trial. The Court also entertained supplemental briefs and heard further oral argument.

In total, the plaintiffs filed five supplemental briefs addressing solely the issues relating to damages. The defendant, in turn, filed four supplemental briefs with respect to plaintiffs' damages. Moreover, the parties submitted numerous letter briefs to the Court.

Set forth below are the Court's findings of fact and conclusions of law with respect to all issues raised by plaintiffs' complaint.

I. *Findings of Fact and Conclusions of Law With Respect to Defendant's Liability*

A. *Background*

Filmline, UA, and Yellowbill entered into a letter agreement, dated February 11, 1982 ("February agreement" or "contract"), which provided for the production, financing, and distribution of a feature length theatrical motion picture entitled "Cross Country" ("the Picture"). See PTO at ¶¶ 5(d), 5(e); Plaintiffs' Exhibit ("PX") 1. This agreement provided that Filmline would produce the picture, Yellowbill would finance that production, and, if certain conditions were satisfied, UA would purchase and distribute the Picture. See PX 1 at 1.[1]

The February agreement set forth a specific mechanism for the development of the screenplay to be used for the Picture. According to the agreement, prior to the start of filming, UA had the right to demand changes in the draft screenplays. See PX 1 at ¶ 2. Filmline, in turn, was obliged to rewrite each draft "in accordance with UA's suggested changes." See id. The contract provided that this revision process would be "repeated until such time as UA

---

1. The February agreement provided that Filmline would retain title to the Picture during production but that title would pass to Yellowbill at the time of Yellowbill's last finance production payment. The agreement further provided that when "UA pays [Filmline] the Cash Purchase Price for the Picture, Yellowbill will transfer full, unencumbered title to UA." See PX 1 at 1. The agreement also contemplated that UA would distribute the Picture. Assuming that UA first recouped the purchase price and various other expenses from the distribution receipts of the Picture, UA was then obligated to pay 50% of distribution receipts to Filmline. See id. at ¶¶ 17–18.

and [Filmline] are satisfied with the final screenplay to be utilized for the production of the Picture." *See id.*

The February agreement further provided that Filmline was to produce the Picture "in strict conformity with the approved screenplay ... (except only for such minor changes as may be required by the exigencies of production)." *See id.* at ¶ 15. If Filmline fulfilled its obligations in that regard, UA was then required to purchase the Picture for a sum equal to the "final certified negative cost of the Picture ... up to the sum of Two Million Five Hundred Thousand Dollars." *See id.*

Pursuant to the February agreement, UA had the right to terminate the agreement in the event of a material breach by Filmline. *See* PX 1 at § 4.01. However, UA could not terminate unless (a) UA first served written notice to Filmline specifying the breach and (b) UA allowed Filmline thirty days to cure the breach. *See id.*[2]

Following the execution of this agreement, Filmline and UA began revising the screenplay. Charles Lippincott, who was then the Vice President of acquisitions at UA, supervised the revisions for UA. *See* PTO at ¶ 5(p). When Lippincott first reviewed the early drafts of the screenplay, he felt the Picture had the potential to become a successful "thriller" and a "hot searing romance." *See* Deposition of Charles Lippincott ("Lippincott Dep.") at 64–65. However, Lippincott was primarily concerned that the drafts did not sufficiently develop the romantic relationship between the two lead characters, Bley and Lois.

In accordance with their contractual right to demand changes in the screenplay, UA prepared several story reports outlining the problems in the screenplay which Lippincott wanted Filmline to address. The first of these story reports is sufficiently illustrative of the types of sweeping conceptual changes Lippincott desired. This report states:

> Bley's transformation from a cold, technical lover with kinky tastes and an aversion to women, into the warm, trusting man who falls in love with Lois could well serve as the basis on which to propel the story. It would greatly improve the story if a character study of Bley could more strongly be incorporated into the narrative by way of emphasizing this interesting psychological breakthrough (or character transformation).

*See* Defendant's Exhibit ("DX") F at 2.

On April 17, 1982, Lippincott met with Pieter Kroonenberg, one of the principals in Filmline, to discuss the most recent draft screenplay, which was dated April 13, 1982. *See* Trial Transcript ("Tr.") at 219. At this meeting, Lippincott stated that he remained dissatisfied with the screenplay and he repeated his requests for conceptual revisions in the screenplay with respect to the development of the romantic relationship between Lois and Bley. These revisions were designed to create the "sensual thriller" Lippincott envisioned the Picture could become. *See* Tr. at 155–56, 187, 224, 281–83, 287; Lippincott Dep. at 21, 24, 29–

---

**2.** Specifically, UA's Standard Terms Contract, which was incorporated into the February agreement, provided in relevant part that:

> In the event [Filmline] shall breach or become in default of performance of any material term, condition or covenant contained in this Agreement, or shall breach any representation or warranty contained in this Agreement, *and shall fail to cure, correct or remedy such breach or default within thirty (30) days after service of written notice specifying same* ... *[UA] may:*
>
> (i) terminate this Agreement in its entirety....
>
> . . . . .
>
> All rights and remedies to [UA] under this Agreement are cumulative and the exercise of one shall not limit or affect its rights concurrently or subsequently to exercise any other rights or remedies as it may have at law, in equity, under this Agreement or otherwise.

*See* PX 1 at § 4.01 (emphasis added).

In the Court's prior oral findings, the Court rejected defendant's argument that the above-quoted cumulative remedies clause enabled UA to terminate the agreement without first giving Filmline written notice of the breach and thirty days to cure because such an interpretation of the contract would have effectively nullified the notice and cure provisions of the agreement. *See* Opinion Tr. at 78; *cf.* 4 *Williston on Contracts* § 600 at 683–84 (3d ed. 1961).

30. Kroonenberg agreed to make those revisions.

Despite Lippincott's dissatisfaction with the April 13 screenplay, it is undisputed that UA conditionally approved that screenplay by an amendment to the February agreement dated April 19, 1982 ("April amendment"). *See* PTO at ¶ 5(e); PX 2 at ¶ 3(a). Specifically, the April amendment provided that UA approved

> [T]he April 13, 1982 revised screenplay, as further revised in accordance with the changes agreed to by UA and Filmline on April 17, 1982, provided that it is acknowledged that UA reserves the right to request minor changes to said screenplay prior to the confirmed May 11, 1982 start date of principal photography.

*See* PX 2 at ¶ 3(a). The April amendment also provided that, "[o]ther than as modified hereby, the [February] Agreement shall remain in full force and effect." *See id.* at 2.[3]

The Court notes that both the February agreement and the April amendment required Filmline to make the conceptual changes in the screenplay prior to the start of filming, which was scheduled to begin on May 11. Moreover, it is also clear that after filming began on May 11, UA would have no right to demand and, therefore, Filmline would have had no obligation to make any further revisions in the screenplay. Indeed, it would be totally inconsistent with the entire structure of the parties' agreement, which provided for screenplay revisions up until the start of filming and then a Picture shot in strict conformity

with that screenplay, to conclude that UA had a contractual right to demand changes in the screenplay once filming began. In short, as the defendant concedes, the parties agreed that there would be an approved screenplay *before* Filmline began to film the Picture. *See* Defendant's Trial Memo at 24.

The next and final screenplay developed by Filmline prior to the start of filming was dated May 7, 1982. Lippincott reviewed the May 7 screenplay on May 11, the day filming was scheduled to begin. This May 7 screenplay did not incorporate the conceptual changes which Lippincott requested and Filmline agreed it would make. *See* Opinion Tr. at 72. Therefore, the conditions for UA's approval of the screenplay set forth in the April amendment were not met. Moreover, Filmline was in material breach of its contractual obligation "to cause each draft of the screenplay to be rewritten in accordance with UA's suggested changes." *See* PX 1 at ¶ 2; *see also* PX 2 at ¶ 3(a). It follows that at this time UA could have terminated the contract, provided that UA first gave Filmline written notice that it was in breach and thirty days to cure that breach, and provided Filmline did not in fact cure that breach. *See* PX 1 at § 4.01.

█ Following Lippincott's review of the May 7 screenplay, however, Lippincott chose neither to assert that breach nor to terminate the contract. Although Lippincott again expressed dissatisfaction with the screenplay and repeated his requests for conceptual changes in the screenplay,[4]

---

3. As contemplated by the February agreement, on April 27, following UA's conditional approval of the screenplay, Yellowbill entered into a financing agreement with Filmline. *See* PX 3; Tr. at 394.

4. On May 3, prior to the finalization of the May 7 screenplay, Lippincott and Kroonenberg began a series of meetings to further discuss the changes Lippincott wanted made in the screenplay. *See* Lippincott Dep. at 48. After reviewing the May 7 screenplay, Lippincott continued to meet with Kroonenberg for several days, requesting many changes in that screenplay. *See* Tr. at 227, 317. Some of the requested changes related to scenes which had not been discussed at the April 17 meeting, i.e., the closing scene.

*See* Lippincott Dep. at 53, 260–61. In general, however, the changes Lippincott requested were the same conceptual changes he had requested back in April, which had yet to be treated to his satisfaction. Thus, Lippincott again expressed his concerns with respect to the development of the romantic relationship between the two lead characters and the creation of a sensual thriller. *See* Lippincott Dep. at 51, 142.

The screenplay revisions Lippincott requested in these meetings were subsequently reflected in an unsigned memorandum prepared by both Lippincott and Kroonenberg. *See* Tr. at 227; Lippincott Dep. at 50; PX 30. This memorandum was addressed to the screenwriter and was designed to serve as an outline or road map for

Lippincott nonetheless chose to go forward with filming, with the hope, shared by Filmline, that the remaining problems in the screenplay could be worked out at a later time during production.

Thus, with Lippincott present on the scene, filming began as scheduled on May 11, 1982 and Lippincott remained on the set until May 16. *See* Tr. at 102; Lippincott Dep. at 140–41. Even after Lippincott left the set, he continued to have frequent telephone conversations with Filmline regarding the progress of the Picture. Then, on June 1 Lippincott returned to the set and reviewed all of the scenes which had been filmed to date. *See* Tr. at 78–80. Stating that all was going well, Lippincott again left the set on June 4, *see* Tr. at 80, 83, but remained in telephone contact with Filmline throughout June, *see* Tr. at 243. In short, instead of terminating the contract on May 11, Lippincott remained actively involved in the filming of the Picture, which continued for six weeks.

Throughout the filming of the Picture, Lippincott repeated his requests for the conceptual changes in the screenplay which Filmline had previously failed to make to his satisfaction. Although Filmline did not believe that it had any contractual obligation to revise the screenplay once filming began, in a good faith effort to please Lippincott, Filmline did deviate substantially from the May 7 screenplay when filming the Picture. *See* Tr. at 100, 106, 180, 229–30. During filming, revised pages of the screenplay were sent by Filmline to Lippincott and the revisions were discussed several times with Lippincott. *See* Tr. at 80–81, 125–26.

At no time during the six weeks of filming did Lippincott give written notice, as

was required by the February agreement, or indeed even oral notice to Filmline that he considered Filmline to be in breach of the agreement. To the contrary, although Lippincott expressed dissatisfaction with the screenplay, at least until June 20, Lippincott assured plaintiffs that the Picture was progressing well and that he believed that the problems in the screenplay could be worked out. Thus, in both May and early June, Lippincott told Filmline that he was generally pleased with the progress of the Picture and that he was optimistic that the changes he wanted in the screenplay would be made. *See* Tr. at 80, 83; *cf.* Lippincott Dep. at 244. In early June, Lippincott gave his oral approval to the changes in the screenplay made by Filmline to date. *See* Tr. at 80–81, 125–26. Moreover, as late as June 15, Lippincott informed Yellowbill that the Picture was going well and that any problems with the Picture could be worked out in the "cutting room." *See* Tr. at 126.

On or around June 20, however, after receiving a large batch of revised screenplay pages for review, Lippincott for the first time complained to plaintiffs that he did not believe Filmline would ever produce the sensuous thriller he had hoped for. *See* Tr. at 118, 165, 203–04, 244; Lippincott Dep. at 248. Nonetheless, even after June 20, Lippincott's conduct continued to be totally inconsistent with the notion that he considered the contract to be at an end. Indeed, Lippincott returned to the set on June 22 as the final scene was being filmed in an effort to work out the problems in the Picture.

On June 24, 1982, with only two days of filming left to be completed, UA for the

---

further revisions in the May 7 screenplay. *See* Tr. at 203–05, 227.

The Court finds as a matter of fact that this memorandum, which was prepared jointly by Lippincott and Kroonenberg and which was addressed only to the screenwriter, did not constitute the written notice of default to Filmline contemplated by the February agreement. To the contrary, the existence of this memorandum, and Lippincott's willingness to engage in this series of meetings, indicates that he was willing to continue the contractual relationship. Thus, far from being a notice of default, this

memorandum tends to negate any inference that Lippincott was contemplating the termination of the contract at this time.

Moreover, the defendant does not argue and the Court does not find that this unsigned memorandum in and of itself obligated Filmline to make the requested revisions. Filmline's contractual obligation to revise the screenplay arose solely out of the February agreement and the April amendment. As noted above, pursuant to these agreements, Filmline had no contractual obligation to revise the screenplay after filming began on May 11.

first time gave Filmline written notice by telex that Filmline was in breach and that UA therefore intended to terminate the agreement. Although during filming Lippincott had made it clear that he did not want the Picture to be shot in conformity with the May 7 screenplay, this telex stated that UA was terminating the agreement on the ground that "[t]he picture is not being produced in strict conformity with the approved screenplay and storyboard." *See* PX 4. Moreover, contrary to the plain and unambiguous provisions of the February agreement, UA did not allow Filmline thirty days to cure that alleged breach before termination.

The Court finds as a matter of fact that UA's justification for termination set forth in the aforesaid telex was a pretext. The Court further finds that the true reason UA terminated the agreement was not because of this or any other alleged breach by Filmline, but rather because UA simply did not want a financial commitment to the Picture. Prior to June 23, Lippincott had assured UA's management that UA had no financial obligation to purchase the Picture and that UA could wait until the Picture was completed to decide if it wanted to purchase it. *See* PX 61 at 156. On or about June 24, however, after examining the February agreement, UA's management was surprised to learn that Lippincott was incorrect—UA was indeed obligated to pay $2,500,000 upon delivery of the Picture. *See* PX 63 at 1678–80. Following this discovery, UA immediately sought to escape its contractual obligations and adopted Filmline's failure to shoot the Picture in conformity with an alleged approved screenplay as a pretext for doing so.[5]

By letter to UA dated June 25, 1982, Filmline denied that it was in breach of the agreement and stated that if UA did not confirm its intention and ability to perform its contractual obligations, Filmline would consider UA's June 24 telex to be an anticipatory breach of the February agreement. *See* PX 5. However, UA never retracted its intention to terminate. Thus, Filmline completed the principal photography of the Picture on June 26, 1982 and subsequently commenced the instant action seeking, *inter alia*, an award of money damages as a consequence of UA's failure to purchase and distribute the Picture.

### B. *Discussion*

■ Although UA stated in the June 24 telex that it was terminating the agreement on the ground that the Picture was not being produced in strict conformity with an alleged approved screenplay, at trial UA abandoned that position and instead argued that it terminated the agreement because there never was an approved screenplay. *See* Defendant's Post-Trial Memorandum at 5. Specifically, at trial UA relied upon the April amendment, which provided that UA approved the screenplay only on the condition that Filmline would revise the April 13 screenplay in accordance with the changes agreed upon at the April 17 meeting. Because Filmline had breached its obligation to so revise the screenplay before May 11, UA argued that there never was any approved screenplay and that UA could terminate the agreement based upon that breach.[6]

The Court rejects this argument. Under New York law, which is concededly applicable, when one party to a contract materially breaches the contract during the course of a continuing performance, the injured party has two options. He may terminate the contractual relations at that time or he may choose to continue performance under

---

5. Of course, if UA had a valid ground for terminating the agreement and asserted that ground in a timely fashion, the fact that UA's termination was also motivated by reasons which would not constitute valid grounds for termination would be legally irrelevant. *Cf. Loma Linda University v. District-Realty Title Insurance Corporation*, 443 F.2d 773, 779 (D.C.Cir. 1971).

6. Although UA never gave Filmline an opportunity to cure that alleged breach, the Court finds as a matter of fact that on June 24 Filmline did not, in any event, have the artistic or financial capacity to properly revise the screenplay as requested by UA within thirty days. Therefore, UA's failure to give an opportunity to cure is of no legal consequence here. *Cf. Allbrand Discount Liquors v. Times Square Stores Corp.*, 60 A.D.2d 568, 399 N.Y.S.2d 700 (2d Dep't 1977).

the contract despite that breach. *See Emigrant Industrial Savings Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 145, 48 N.E.2d 293, 299 (1943). If the injured party chooses not to terminate the contract, he surrenders his right to terminate later based on that breach. *See 5 Williston on Contracts*, § 683 at 270 (3d ed. 1961). In short, as the Second Circuit has noted, under New York law the power to terminate a contract is a power of election. *See Apex Pool Equipment Corporation v. Lee*, 419 F.2d 556, 562 (2d Cir.1969). Once the non-breaching party elects to continue the contract, he may not at a later time renounce his election and seek to terminate based on the prior breach.

The instant case presents a clear example of that principle. When Filmline failed to revise the April 13 screenplay in accordance with the changes agreed upon at the April 17 meeting, Filmline was in breach. This breach continued until May 11, the day Lippincott reviewed the May 7 screenplay and filming began. At that time, UA had the contractual right to send to Filmline written notice of default, allowing Filmline thirty days to cure that breach. Rather than doing so, however, UA elected to continue its contractual relations with Filmline for six more weeks.

Thus, following Filmline's breach UA continued to work with Filmline as if the contract were still in full force and effect. The Court finds that Lippincott's expressions of dissatisfaction with the May 7 screenplay did not constitute the written notice of default required by the contract. Moreover, Lippincott's active participation in the filming process after May 11 is completely inconsistent with and, therefore, negates any inference that UA considered the contractual relations to be at an end. Clearly, Lippincott made a business decision on May 11 to continue the contractual relations despite his dissatisfaction with the screenplay. Therefore, the Court finds that UA lost its right to terminate the agreement on the ground that Filmline breached its obligation to revise the screenplay in accordance with the terms of the April amendment. *See Apex, supra*, 419 F.2d at 562.[7]

Moreover, on the facts of this case, it was particularly important for UA to make a prompt election to terminate the contract, and to give prompt notice to plaintiffs of that election. The April amendment put UA on notice that filming would begin on May 11, and that thereafter UA would have no contractual right to demand any changes in the screenplay. These contractual provisions were obviously designed to insure that Filmline would not incur any expense in filming the Picture unless UA was first obligated to purchase it. In light of these contractual provisions, if UA wanted to rely on Filmline's failure to properly revise the screenplay as an excuse for its non-performance under the contract, it was incumbent upon UA to elect to do so on or about May 11. Had UA done so, in all likelihood the Picture would never have been filmed and plaintiffs would never have incurred any expense in filming the Picture. Having elected instead to go on with the contract, UA could not later, after six weeks of filming, terminate the agreement based upon that prior breach.

Nor may UA escape the consequences of its election by arguing that Filmline's subsequent failure to make the requested changes in the screenplay *during filming* excused UA's nonperformance. Filmline did in fact make a good faith effort to satisfy Lippincott's repeated requests for changes in the screenplay, and although its effort ultimately failed, that

7. The Court rejects plaintiffs' argument that UA is somehow estopped from asserting this breach on the ground that Yellowbill reasonably relied upon UA's approval set forth in the April amendment when it executed the April 27 financing agreement with Filmline. *See* Plaintiffs' Post-Trial Brief at 6; Tr. at 395–96. UA's approval in the April amendment was concededly conditional, a fact which Yellowbill knew or should have known at that time. However, the question of Yellowbill's reliance on the conditional approval of the screenplay has nothing whatsoever to do with the issues in this case. Rather, it is UA's, Yellowbill's, and Filmline's decision to continue performance under the contract, notwithstanding Filmline's failure to comply with the conditions set forth in the April amendment for approval of the screenplay, that is dispositive of the merits of plaintiffs' breach of contract action.

failure was not a contractual breach. Pursuant to both the February agreement and the April amendment, UA had no contractual right to demand any changes in the screenplay once filming began on May 11. Consequently, Filmline was not obligated to make those changes and UA cannot rely on Filmline's failure in that regard as a basis for terminating its own obligations under the contract.

■ The only other alleged breach by Filmline which UA suggests could serve as an excuse for UA's nonperformance was Filmline's failure to shoot the Picture in strict conformity with the May 7 screenplay. Quite aside from the fact that UA never wanted the picture shot in conformity with the May 7 screenplay,[8] UA did not allow Filmline thirty days to cure that alleged breach, a task which Filmline could have easily accomplished, see Tr. at 417, even though, as the Court has found, it could not have accomplished the much more difficult task of producing the sensuous thriller that Lippincott desired. *Compare* Note 6, *infra.* Therefore, UA could not terminate the contract on the basis of this alleged breach. *Cf. General Supply and Construction Co. v. Goelet*, 241 N.Y. 28, 34, 148 N.E. 778 (1925) (where contract specifies conditions precedent to right of termination, those conditions must be complied with or termination is wrongful); *Scordley v. Olsher*, 18 Misc.2d 424, 186 N.Y.S.2d 883 (N.Y.App. Term, 1st Dep't 1959).

In short, UA had no contractual right to terminate the agreement on June 24. Therefore, UA is liable to plaintiffs for damages incurred as a result of UA's wrongful failure to purchase and distribute the Picture.

## II. *Findings of Fact and Conclusions of Law With Respect to Plaintiff's Damages*

### A. *Direct Damages*

■ Pursuant to the February agreement, UA was obligated to purchase the Picture for an amount equal to the "negative cost" of the Picture, up to $2,500,000. *See* PX 1 at ¶ 15. The negative cost includes "all the costs of production, both the creative and the technical expenses." *See* Tr. at 520.[9]

Filmline retained the accounting firm of Peat, Marwick, Mitchel & Co. to perform an audit of the Picture's negative cost. The audit was performed in accordance with generally accepted auditing procedures, under the supervision of Emmanuel Veinish, a partner in the accounting firm. *See* Tr. at 510–11. At trial, Veinish testified that the audit showed a negative cost exceeding $2,600,000. *See* Tr. at 520; *see also* PX 59.

The Court finds Veinish's testimony, which was unrebutted at trial, to be credible.[10] Therefore, the Court finds as a matter of fact that the negative cost of the Picture exceeded $2.5 million. It follows

8. Although the Court need not reach the issue, the Court notes that it is not clear whether Filmline was even obligated to shoot the Picture in strict conformity with the May 7 screenplay, a screenplay with which both UA and Filmline were dissatisfied. The contractual requirement that Filmline shoot the Picture in strict conformity with the approved screenplay, *see* PX 1 at ¶ 15, necessarily assumes that there is an approved screenplay. However, UA never in fact approved the May 7 screenplay, *cf.* Lippincott Dep. at 206, but instead elected to proceed with filming without an approved screenplay in the hopes that Filmline would succeed in improving the screenplay during filming. Because there was never in fact any approved screenplay, Filmline's obligation to shoot the Picture in strict conformity with an approved screenplay never arose.

9. The February agreement also provided that the "above-the-line elements" of the Picture's budget could not exceed $1.1 million. *See* PX 1 at ¶ 3(a). Above-the-line elements are the creative elements of the Picture as opposed to the technical elements. Above-the-line elements include the director's, producer's and principal stars' costs and fees as well as the costs incurred in developing the script. *See* Tr. at 521. The credible evidence at trial established that the above-the-line elements did not exceed $1.1 million. *See id.*

10. The defendant presented no witnesses to contradict Veinish's assessment of the negative cost. The Court has fully considered the arguments raised by the defendant with respect to Veinish's testimony and the Court does not find those arguments persuasive.

that the plaintiffs incurred direct damages in the amount of $2.5 million as a result of UA's wrongful termination of the contract.

### B. *Consequential Damages*

Plaintiffs seek a total of $113,420 in consequential damages. For the reasons set forth below, the Court rejects these damage claims.

■ Plaintiffs first seek $66,701 in consequential damages representing a finance penalty incurred by Yellowbill after it defaulted on a loan. *See* Summary of the Court's Findings of Fact and Conclusions of Law on the Issue of Liability and Plaintiffs' Proposed Findings of Fact and Conclusions of Law on the Issue of Damages ("Plaintiffs' Proposed Findings") at ¶ II(A)(4)(ii). According to the plaintiffs, Yellowbill had taken out the loan to finance the Picture but was unable to repay the loan due to UA's failure to pay the $2,500,-000. There is, however, no evidence that UA knew or had reason to know of the details of Yellowbill's financial arrangements. Since UA had no reason to know that a breach would result in this loss to plaintiffs, and this loss was neither a natural nor probable consequence of UA's breach, the loan penalty is not properly recoverable by the plaintiffs. *Cf. Deutsch v. Health Insurance Plan of Greater New York,* 751 F.2d 59, 68 (2d Cir.1984).

■ Plaintiffs also seek $41,701 in consequential damages allegedly incurred in producing the soundtrack for the Picture. *See* Plaintiff's Proposed Findings at ¶ II(A); Tr. at 426. According to the plaintiffs, without UA's backing, they were unable to attract a major recording artist for the soundtrack. Plaintiffs contend that without a major recording artist the soundtrack did not generate sufficient revenues to cover its production costs.

The Court rejects this item of damages as well. The February agreement specifically states that UA will not be liable for the cost of producing the soundtrack. *See* PX 1 at ¶ 6. Moreover, it is far too speculative to assume that even if UA had fulfilled its contractual obligations, the soundtrack would have generated appreciably greater revenues.[11]

### C. *Mitigation of Damages*

■ Following UA's wrongful termination of the contract, plaintiffs were under a duty to mitigate their damages. *See Air Et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 494 (2d Cir.1985). In fulfillment of that duty, Filmline completed production of the Picture and Yellowbill arranged for the distribution of the Picture. The Court finds as a matter of fact that the plaintiffs in good faith sought to maximize their financial return from the distribution of the Picture, thereby properly mitigating their damages.

Yellowbill entered into two agreements with a company entitled New World Pictures ("New World") to provide for the distribution of the Picture. Under these agreements, New World is responsible for the distribution of the Picture and Yellowbill receives a share of the distribution proceeds.

In the first agreement ("the Foreign agreement"), dated April 27, 1983, Yellowbill assigned to New World the distribution rights for the Picture in foreign territories outside of the United States and Canada. *See* PX 57 at 3. This Foreign agreement was subsequently amended by letter agreement dated October 12, 1983. *See* DX EK. In the second agreement ("the Domestic agreement"), also dated October 12, 1983, Yellowbill licensed to New World the exclusive distribution rights for the Picture in the United States and Canada. *See* PX 58.

---

**11.** Plaintiffs also argue that following UA's breach, Yellowbill was forced to become more actively involved in the production and distribution of the Picture, as opposed to merely advancing funds to Filmline's production account. *See* Tr. at 424. As a result, Yellowbill claims they incurred $3,644 in legal fees and $1,375 in travel expenses for a trip to Montreal to moniter the completion of the Picture. *See* Plaintiffs' Proposed Findings at ¶ II(A)(4)(iii), (iv); Tr. at 125–26. Yellowbill claims these expenses would not have been incurred but for UA's termination. The Court does not find that those expenses are properly chargeable to UA as consequential damages, because UA could not have reasonably forseen its breach would result in those expenses.

The defendant has the burden of proof with respect to mitigation of damages and, therefore, must prove how much plaintiffs will receive from the distribution of the Picture. *See Katz Communications Inc. v. Evening News Association,* 705 F.2d 20, 26 (2d Cir.1983).[12] As set forth in more detail below, the Court finds that the plaintiffs will receive $300,000 under the domestic agreement and $120,150 under the foreign agreement. The Court also finds that the plaintiffs will receive $3,060 in revenue from the sale of the Picture's soundtrack, *see* Tr. at 411, for a total of $423,210. However, the Court further finds that Yellowbill has incurred $134,000 in expenses in connection with its efforts to generate this income, which amount must, of course, be subtracted from plaintiffs' total mitigation income. Therefore, the Court finds that plaintiffs' total net mitigation income to be $289,210.

(i) *Mitigation Income Received By Plaintiffs Pursuant to the Domestic Distribution Agreement*

Pursuant to the domestic agreement, New World initially paid to Yellowbill a non-refundable $300,000 advance. *See* PX 58 at ¶ 6. For the reasons set forth below, the Court finds as a matter of fact that the plaintiffs will not receive any more money under the domestic agreement over and above this advance.

The domestic agreement provides that Yellowbill is entitled to its share of domestic receipts only after New World first deducts its distribution expenses and fees, and then also recoups the $300,000 advance. *See* PX 58 at ¶¶ 5, 6. The financial statements provided by New World reveal that New World's distribution expenses have consistently exceeded gross receipts and, therefore, as of the close of trial Yellowbill had not received any additional money under the domestic agreement. *See* DXs EF, EG.

Moreover, this deficit has been increasing. The financial statement for the period ending March 31, 1984 showed negative net receipts of $290,096, *see* DX EG, while the statement for the period ending June 30, 1984, showed a deficit of $365,855, *see* DX EF.[13] New World must recoup this $365,855 deficit, plus future expenses, future

---

**12.** The Court rejects defendant's argument that plaintiffs should bear the burden of persuasion on this issue because the facts necessary to prove mitigation income are allegedly solely within the knowledge of the plaintiffs. *Compare Nader v. Allegheny Airlines,* 512 F.2d 527, 538 (D.C.Cir.1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). The evidence establishing what plaintiffs' have received to date, consisting generally of New World's accounting statements, were provided to the defendant in discovery, and plaintiffs are therefore in no better position to prove what they can be expected to earn from the distribution of the Picture than is the defendant.

**13.** The Court is unpersuaded by defendant's argument that New World has artificially inflated its domestic expenses, thereby overstating the domestic deficit. *See* Defendant's Second Supplemental Post-Trial Memorandum on the Issue of Damages at 15–17. In support of its argument, defendant principally relies on a letter from plaintiffs' counsel to defendant's counsel which explains New World's method of calculating expenses for "Prints and Materials." *See* DX GC at 3. According to this letter, New World allocates costs *solely* attributable to domestic distribution as domestic costs and costs *solely* attributable to foreign distribution as foreign costs. However, certain distribution expenses are not solely attributable to either domestic or foreign distribution. According to this letter, New World allocates 75% of these joint costs to domestic distribution and 25% to foreign distribution.

Defendant argues that this 75% to 25% allocation is arbitrarily designed to inflate domestic expenses. According to the defendant, New World has an incentive to do this because, pursuant to the foreign agreement, New World can only recoup up to $100,000 in expenses, whereas there is no cap with respect to domestic expenses in the domestic agreement.

The Court does not find New World's accounting procedures to be arbitrary. Merely because an expense is jointly attributable to both domestic and foreign distribution does not mean New World must allocate the expense on a 50/50 basis. It is entirely rational for New World to conclude that a greater percentage of joint costs should be allocated to domestic expenses because greater revenue is expected from domestic distribution. Indeed, the fact that New World and Yellowbill agreed to a cap on New World's foreign expenses indicates that they anticipated that a greater portion of expenses would be incurred on domestic distribution. Moreover, it is far too speculative to conclude that Yellowbill could increase its mitigation income by successfully challenging New World's

distribution fees, and the $300,000 advance from future gross receipts before Yellowbill will receive any payments over and above the advance. *See* PX 58 at ¶¶ 5, 6.

Although the Court cannot predict future revenues with absolute precision, based on all of the evidence the Court finds that the Picture will earn at most $800,000 in future gross domestic distribution receipts, and probably less.[14] The Court further finds that New World will incur an additional $320,000 in future expenses in generating that $800,000 in gross income.[15] Out of the $800,000 in future gross receipts, therefore, New World must recoup the $365,855 deficit of past expenses plus the $320,000 in future expenses, for a total of $685,855 in expenses recouped. Moreover, the Court finds that the remaining $114,145 in receipts ($800,000–685,855) will be recouped by New World as distribution fees which, except for fees on receipts from Canadian pay television, range from 25% to 40% of gross domestic receipts. *See* PX 58 at ¶ 4.

Because the entire $800,000 in future gross receipts will go to New World as compensation for their expenses and fees, Yellowbill will not receive any more money under the domestic agreement. In addition, New World will not be able to recoup any of the $300,000 advance from domestic receipts, and, therefore, pursuant to both the domestic and foreign agreements, New World can seek to recoup the advance from foreign receipts as described below. *See* PX 58 at ¶ 6; DX EK at ¶ 4.

(ii) *Mitigation Income Received By Plaintiffs Pursuant to the Foreign Distribution Agreement*

The foreign agreement provides that Yellowbill is entitled to receive the balance of foreign distribution receipts remaining after New World subtracts distribution expenses (up to $100,000), a 15% distribution fee, and taxes and residuals. *See* PX 57 at ¶¶ 4, 5. This agreement was subsequently amended on October 12, 1983 to provide that where, as here, domestic revenues are insufficient to enable New World to recoup the $300,000 advance, New World may recoup that advance from gross foreign distribution revenues in excess of $259,000. *See* DX EK at ¶ 4; *see also* PX 58 at ¶ 6.

The credible testimony of Adrian Scropes, a director of Yellowbill, establishes that the Picture will earn at most $500,000 in total gross foreign distribution income. *See* Tr. at 608; *cf.* DXs FA–FU, FV, EV, EY.[16] Because New World can recoup its $300,000 advance from foreign gross

---

accounting procedures in this or a subsequent civil action.

**14.** The evidence presented at trial indicates that the Picture will earn a maximum of approximately $1,100,000 and a minimum of approximately $650,000 in future gross domestic distribution revenues. *See* Deposition of Paul Almond ("New World Dep.") at 62–63, 101, 122–23, 125–26, 127–28. Without setting forth any persuasive reason for its argument, defendant argues that the Picture will earn the maximum amount predicted. Defendant's own witness, however, a well-known film critic, opined that the Picture was "the kind of movie that one might see on the bottom of a triple bill on 42nd Street, if it got that lucky." *See* Tr. at 508. Indeed, defendant's position throughout this case has been that the Picture was nothing more than a cheap exploitation film. In light of this poor review of the Picture, the Court declines to accept defendant's speculative suggestion that the current trend of meager gross receipts will somehow improve over time. *Cf. Cornell v. T.V. Development Corporation,* 17 N.Y.2d 69, 74–75, 268 N.Y.S.2d 29, 33, 215 N.E.2d 349, 352 (1966). Therefore, the Court concludes that the Picture

will earn no more than $800,000 in future gross domestic revenues.

**15.** Paul Almond of New World testified that it would take $1,000,000 in future *gross* receipts to generate positive *net* receipts of $600,000. *See* New World Dep. at 124–25. The Court finds this testimony to be credible. Based on this same proportion, *i.e.,* $10 in future gross receipts will generate $6 in net receipts, the Court finds that $800,000 in gross receipts will generate $480,000 in net receipts. Stated in the alternative, New World will incur $320,000 in future expenses to obtain the $800,000 in future gross revenues.

**16.** The Court rejects defendant's argument that the minimum guarantees set forth in Schedule A of the Foreign Agreement, *see* PX 57 at 8, represent the amount the Picture will earn from foreign distribution. The minimum guarantees are not estimates of sales figures but merely minimum figures above which New World need not obtain Yellowbill's approval before licensing the distribution of the Picture in foreign territories. *See* New World Dep. at 102–03; PX 57 at ¶ 6.

receipts in excess of $259,000, all receipts above $259,000 will go to New World. Yellowbill will, therefore, only receive its share of the first $259,000 in gross receipts. *See* DX EK at ¶ 8.

The calculation of Yellowbill's share of the first $259,000 in gross receipts is determined by reference to paragraph 5 of the foreign agreement. Thus, as noted above, Yellowbill's share is the balance after New World subtracts distribution expenses, a 15% distribution fee, taxes, and residuals. *See* PX 57 at ¶ 5.[17] Approximately $100,000 in distribution expenses will be incurred by New World in generating the first $259,000 in gross foreign distribution receipts. *See* New World Dep. at 133–34. Therefore, Yellowbill will receive at most $120,150 under the foreign agreement.[18]

(iii) *Distribution Expenses Incurred by Plaintiffs*

Plaintiffs argue that they have incurred approximately $264,000 in expenses in connection with the distribution of the Picture. *See* Plaintiffs' Proposed Findings at ¶ II(A)(15). According to the plaintiffs, this sum must be subtracted from the revenue Yellowbill will receive pursuant to both the foreign and domestic agreements. For the reasons set forth below, the Court finds that only $134,000 of plaintiffs' claimed expenses are properly deductible from their mitigation income.

Following UA's repudiation of the contract and refusal to distribute the Picture, Yellowbill was forced to become actively involved in supervising the distribution pro-

---

**17.** Defendant argues that ¶ 4 of the amendment to the foreign agreement altered the method of calculating Yellowbill's share of gross receipts set forth in ¶ 5 of the original foreign agreement. Specifically, defendant argues that, pursuant to the amendment, Yellowbill will receive the entire $259,000 free and clear of any deduction by New World for its fees and expenses. The Court rejects this argument.

Paragraph 4 provides in relevant part:
New World may recoup its advance to Yellowbill in the amount of U.S. $300,000, made pursuant to Paragraph 6 of the Domestic Agreement, to the extent not recouped from [Yellowbill's] share under the Domestic Agreement, from Gross Receipts under the Foreign Agreement in excess of $259,000, *after payment to [Yellowbill] of its share of said $259,000 of Gross Receipts.*

. . . . .

*Said recoupment [of the domestic advance] from Gross Receipts in excess of $259,000* shall be made as follows. New World shall deduct from said Gross receipts first, New World's distribution expenses and distribution fees in the same manner and order set forth in Paragraphs 4 and 5 of the Foreign Agreement, and second, New World's recoupment of said advance. Thereafter New World shall remit the balance of Net Receipts, if any, to Yellowbill.
*See* DX EK at ¶ 4 (emphasis added).
As noted above, ¶ 5 of the foreign agreement provides that New World may recover its distribution fees and expenses before Yellowbill receives any of the proceeds from the foreign distribution of the Picture. The amendment to the foreign agreement, as quoted above, focuses only on the manner in which the $300,000 advance is recouped from gross receipts in excess of $259,000. Nothing in this amendment purports to alter the mechanism for distributing gross receipts under $259,000, as set forth in ¶ 5

of the foreign agreement. This is made evident by the fact that the amendment states that Yellowbill is only entitled to *its share* of the first $259,000 in gross receipts, which is clearly inconsistent with the notion that it was entitled to the entire $259,000.
Indeed, it is implausible that in amending the foreign agreement to allow New World to recoup the advance from gross receipts above $259,000, that New World and Yellowbill also intended to cut off New World's contractual right to recoup expenses and fees from gross receipts under $259,000. Rather than being designed to provide such a windfall for Yellowbill, the amendment was designed to insure that New World recoups the advance from funds which would, in the absence of this recoupment provision, go to Yellowbill and not from funds which Yellowbill had no right to in the first place. Thus, in determining the amount of the recoupment from gross receipts above $259,000, this amendment provides that New World's fees and expenses are deducted first, since pursuant to the foreign agreement New World receives those sums in any event.
The Court also notes that the current practice of New World in remitting funds to Yellowbill is consistent with the Court's finding, as the accounting statements show that New World has deducted fees and expenses even though gross foreign receipts have not yet reached $259,000. *See* Tr. at 450; New World Dep. at 129–31; DXs EG, EF.

**18.** This figure is computed as follows:
$259,000–$100,000 (expenses)—$38,850 (15% distribution fee).
Neither party has come forward with any evidence with respect to the amount of taxes and residuals which must also be deducted from the $259,000 and, therefore, the Court assumes that those sums are zero.

cess. *See* Tr. at 617. Plaintiffs contend that that portion of Yellowbill's general overhead allocable to Yellowbill's distribution efforts should be deducted from the mitigation income. *See* Tr. at 617–20. According to the plaintiffs this amounts to $130,000. *See* Plaintiffs' Proposed Findings at ¶ II(A)(15)(iv).

The Court rejects this claim for overhead. The only case cited by plaintiffs with respect to this issue, *Guy James Const. Co. v. Trinity Industries, Inc.*, 644 F.2d 525, 532–33 (5th Cir.1981), *modified on other grounds*, 650 F.2d 93 (1981), holds that a plaintiff may recover general overhead as an expense only if there is proof of "added" overhead costs proximately resulting from the defendant's breach. Added costs are costs "in excess of normally incurred fixed expense items." *See id.* at 533. Moreover, to recover overhead expenses a plaintiff must establish that, due to defendant's breach, the plaintiff was unable to take on alternative jobs which could have absorbed the added overhead. *See id.* In short, a plaintiff may only recover overhead expenses if these expenses represent a loss proximately flowing from defendant's breach.

The Court finds that all of plaintiffs' claimed overhead expenses would have been incurred even if UA had not terminated the agreement. *See* Tr. at 620–25. For example, although the plaintiffs allege that a substantial portion of Yellowbill's office space was devoted to the distribution of the Picture, it is undisputed that the rent for the office would have been incurred even if UA had not terminated the agreement. *See id.* at 620. Moreover, there is no evidence in the record that there were other projects which, but for UA's refusal to distribute the Picture, Yellowbill could have taken on which would have absorbed the overhead costs. Therefore, the Court will not allow a deduction from mitigation income for fixed overhead expenses.

The Court finds however, that the remainder of plaintiffs' claimed expenses, totalling $134,000, are well-supported by the evidence and properly recoverable.[19] Reducing plaintiffs mitigation income accordingly, the Court concludes that the plaintiffs will receive $289,210 ($423,210–$134,000) in net mitigation income. This amount must, of course, be subtracted from plaintiffs' total damage claim.

### D. *Benefits Received By the Plaintiffs As A Result of Defendant's Wrongful Termination*

After the trial in the instant action was completed, defendant argued for the first time that the plaintiffs' damages must be reduced by the amount it would cost plaintiffs to reshoot the entire Picture in strict conformity with the May 7 screenplay. Defendants' argument was set forth by defendant as follows:

> Contract damages are determined by placing the parties in the position that they would have been in if no breach had occurred.... In this case, the Court held that UA's breach was its failure on June 24, 1982 to give plaintiffs an opportunity to cure their default by allowing them to reshoot the film to conform to the May 7 approved screenplay. Thus, if we assume, as the law requires us to do, that there had been no breach, then UA would have given plaintiffs an opportunity to cure and plaintiffs would have reshot the film in conformity with the May 7 approved screenplay.

*See* July 17 Letter Brief at 2.

At the outset, the Court notes that UA distorts the record by claiming that "its breach was its failure on June 24, 1982 to give the plaintiffs an opportunity ... to

---

**19.** According to the testimony of Adrian Scrope, Yellowbill has incurred the following expenses in connection with the distribution of the Picture: legal fees of $40,000, *see* Tr. at 647; $35,000 in fees for marketing and advertising services in North America, *see* Tr. at 452, 627; DX DG; $20,000 in fees for publicity services, *see* Tr. at 452, 631; DX DJ; travel costs of $18,000 for attendance at Cannes Film Festival to pro-

mote the Picture and for negotiations for alternative distribution agreements, *see* Tr. at 449, 452; and distribution fees of $21,000 to Yellowbill's affiliated company (equal to 5% of total foreign and domestic revenue received by Yellowbill), *see* Tr. at 452, 641. Although the defendant argues that many of these items are duplicative and illusory, the Court finds the testimony of Scrope to be credible.

reshoot the film to conform to the May 7 approved screenplay." The fact is, defendant's breach consisted of its improper attempt to terminate the agreement based on an alleged prior breach by Filmline—Filmline's failure to properly revise the screenplay—which UA had previously elected not to assert. Indeed, UA's present argument is totally inconsistent with UA's theory of the case presented at trial, pursuant to which UA insisted that the May 7 screenplay was not the approved screenplay and, indeed, that there never was any approved screenplay.

Moreover, the Court finds that had UA not terminated the agreement, UA certainly would not have required Filmline to reshoot the entire Picture to conform to the May 7 screenplay. The credible evidence at trial overwhelmingly establishes that, although Lippincott was never satisfied with the Picture, he preferred the Picture as it was ultimately shot to the May 7 version. Indeed, the only time Lippincott stated any preference for any scene in the May 7 version was on June 20. At that time, Lippincott expressed a preference for only eleven scenes in their May 7 form. *See* Damages Hearing Transcript ("Damages Tr.") at 30–32; PX 74; Lippincott Dep. at 249–54; DXs AA, M. Therefore, the Court finds that the plaintiffs have established by a preponderance of the evidence that, had UA not terminated the

agreement, Lippincott would have requested Filmline to conform only those eleven scenes to the May 7 screenplay and Filmline could and would have done so.

UA does not seriously dispute this finding. Instead, UA argues that the Court must assume, contrary to fact, that on June 24 UA would have required Filmline to reshoot the entire Picture to conform to the May 7 screenplay merely because UA allegedly had the contractual right to do so. However, as plaintiffs correctly note, UA also had a contractual obligation to deal in good faith with Filmline. *Cf. Gelder Medical Group v. Webber*, 41 N.Y.2d 680, 684, 363 N.E.2d 573, 577–78, 394 N.Y.S.2d 867, 871 (1977); *In re Friedman*, 64 A.D.2d 70, 82, 407 N.Y.S.2d 999, 1009 (2d Dep't 1978). In light of Lippincott's preference for the Picture as it was ultimately shot over the May 7 version, a request by Lippincott on June 24 for Filmline to conform the entire Picture to the May 7 screenplay would have represented a bad faith attempt to unnecessarily render the production of the Picture as costly as possible for plaintiffs. This UA could not do. Moreover, such a request by Lippincott would have been especially egregious since it was Lippincott's repeated insistence on revisions in the May 7 screenplay which caused Filmline to deviate from that screenplay during filming in the first place.[20]

---

**20.** The Court rejects UA's argument, set forth in a letter to the Court, that "[s]ince UA never gave written approval to any of the changes plaintiffs made in the May 7 screenplay, plaintiffs should be required to bear the cost of reshooting all scenes that deviated from the May 7 screenplay." *See* December 19 Letter Brief at 5. In support of its argument, defendant relies upon section 1.02(b) of the February agreement which provides that "[n]o item subject to [UA's] approval hereunder shall be deemed to have been approved by [UA] unless [UA] shall have specifically approved the same in writing." *See* PX 1 at 1.02(b); *see also id.* at 1.02(e). Revisions in the approved screenplay were subject to UA's approval. *See id.* at 1.02(c), (d).

The contractual provisions relied upon by defendant, however, require written approvals only for deviations from the *approved* screenplay. Those provisions have no applicability where, as here, there never was in fact any approved screenplay because UA elected to begin filming without one. *Cf.* Note 8 *supra.* Moreover, the contractual provisions requiring

written approvals were designed to protect UA against the risk that Filmline would fail to shoot the Picture in strict conformity with the approved screenplay and then later, relying on oral testimony, argue to a court or a jury that UA orally approved that failure. Those contractual provisions, which, like the Statute of Frauds, sought to protect UA from the risks of oral testimony, however, would not be well-served where concededly UA specifically encouraged Filmline to deviate from the May 7 screenplay during filming. *Cf. M.H. Metal Products Corporation v. April*, 251 N.Y. 146, 150, 167 N.E. 201, 202 (1929) (unconscionable and subversive of the policies underlying the Statute of Frauds to allow a defendant to assert the Statute when the defendant affirmatively causes the plaintiff to consent to the oral modification of the contract and the plaintiff thereby incurs expenses to his detriment.)

More importantly, the fact that UA did not approve in writing any revisions in the May 7 screenplay, or indeed the fact that UA did not

*Judo, Inc. v. Delaney*, 42 Misc.2d 504, 505, 248 N.Y.S.2d 386, 387 (N.Y.Civ.Ct. 1964), relied upon by UA, is not to the contrary. In *Judo*, the defendant entered into a contract with the plaintiff for a course of instruction, but defaulted before taking any lessons. Since the plaintiff in *Judo* had not yet incurred any costs in providing the instructions to the defendant, an award to the plaintiff of the full contract price would have placed the plaintiff in a better position than he would have been in had the defendant not breached the contract. To avoid such a windfall to the plaintiff, the court held that the plaintiff was only entitled to receive the contract price less plaintiff's cost of performance. *See also R & I Electronics, Inc. v. Neuman*, 66 A.D.2d 836, 411 N.Y.S.2d 401 (2d Dep't 1978); *Birnhak v. Hollender*, 29 Misc. 640, 61 N.Y.S. 118 (N.Y.App. Term 1899).

Unlike *Judo*, in the instant case, with the exception of the cost of conforming the eleven scenes Lippincott preferred in the May 7 form, the plaintiffs have incurred the full cost of producing the Picture. Indeed, the plaintiffs have expended over $2,600,000 in performing their contractual obligations. Therefore, a reduction in plaintiffs' damages in an amount equal to the cost of conforming those eleven scenes is at best all that is necessary and appropriate to put the plaintiffs in the exact position they would have been in had UA not wrongfully terminated the agreement.[21]

Since plaintiffs bear the burden of proving their claim for damages, plaintiffs bear the burden of proof with respect to the cost of conforming those eleven scenes which Lippincott preferred in their May 7 form. For the reasons set forth below, the Court finds that it would have cost the plaintiffs $20,901 to conform those scenes to the May 7 screenplay.[22]

specifically orally approve all revisions, is legally irrelevant to the question of whether on June 22 UA could have in good faith required Filmline to conform the entire Picture to the May 7 screenplay. Whether or not UA approved those revisions, the fact remains that UA insisted upon revisions from the May 7 screenplay and UA clearly preferred the Picture as shot over the May 7 version. That being the case, on June 22, UA would not have and in good faith could not have required Filmline to reshoot the entire Picture to conform to the May 7 screenplay, a screenplay which UA concedes it never wanted. UA's real complaint is that, notwithstanding its preference for the Picture as shot over the May 7 version, Filmline never made the changes in the screenplay agreed upon at the April 17 meeting. However, UA's remedy for Filmline's failure to make those revisions was to give written notice of Filmline's breach prior to the start of filming, which UA elected not to do.

21. The cases cited by the defendant which involve the substantial performance doctrine are likewise legally and factually inapposite. Pursuant to these cases, when a plaintiff substantially performs a contract, the plaintiff may recover the contract price less appropriate allowance for the cost of completing omissions and correcting defects. *See, e.g., Mirisis v. Renda*, 83 A.D.2d 572, 573, 441 N.Y.S.2d 138, 139 (2d Dep't 1981); *Pilgrim Homes & Garages, Inc. v. Fiore*, 75 A.D.2d 846, 847, 427 N.Y.S.2d 851, 853 (2d Dep't 1980); *Conforti v. Singhi*, 182 N.Y.S. 899, 900 (1st Dep't 1920). However, Filmline's failure to shoot the Picture in strict conformity with the May 7 screenplay cannot be properly viewed as an omission or a defect in performance which would require a reduction in plaintiffs' damages for the simple reason that such performance was neither requested, wanted, or expected.

22. Plaintiffs argue that they would not have incurred any additional expense in reshooting the Picture to conform any scenes which Lippencott preferred in their May 7 form because the entire cost of reshooting such scenes would have been covered by a completion guaranty with a company called Murray Film Finance Limited ("Murray Film"). *See* Plaintiffs' Summary Post-Trial Brief on the Issue of Damages at 5–6; PX 70. The Court rejects this argument. It was incumbent upon plaintiffs to prove that they would have called upon Murray Film to honor the terms of the completion guaranty, which plaintiffs have failed to do. Plaintiffs' failure in that regard is understandable because it is unlikely that they would have called upon Murray Film, since, in a separate document, Filmline agreed to fully indemnify Murray Film for any expenses Murray Film may incur under the completion guaranty. *See* DX DF at ¶ 4. Although plaintiffs argue that only Filmline and not Yellowbill agreed to indemnify Murray Film, that circumstance is irrelevant to plaintiffs' failure to prove that they would have looked to the guaranty. Moreover, the Court can see no reason why it should separate out the two plaintiffs solely for the purposes of this issue when plaintiffs have at no time sought separate damage awards for each plaintiff and, indeed, have consistently treated the plaintiffs as essentially identical for the purposes of this litigation. *See, e.g.,* Plaintiffs' Proposed Findings at ¶ II(B)(6).

David Patterson, a co-owner of Filmline and co-producer of the Picture, testified that four of the eleven scenes which Lippincott objected to were added to the Picture after May 7. Therefore, these scenes simply could have been edited out of the Picture during post-production work to conform to the May 7 screenplay at no additional cost. *See* Damages Tr. at 36–38.

Moreover, Patterson testified that three other scenes could have also been conformed to the May 7 screenplay during post-production work without any additional filming. *See id.* at 39–40, 86–88, 92. Patterson specifically recalled that these scenes were shot in several different ways and, at the time of editing, there was sufficient additional footage which could have been edited into the Picture to conform those three scenes to the May 7 screenplay. To the extent there was not sufficient additional footage to conform dialogue differences between those three scenes as shot in the Picture and the May 7 version, Patterson testified that those dialogue differences could have been rectified during post-production work by using a voice-over technique. *See id.* at 39. According to Patterson, the voice over technique is a normal editing technique wherein new dialogue can be slipped into the Picture at a time when the lip movement of the speaker is not on camera. *See id.* at 39–40.[23]

The Court finds the testimony of Patterson to be credible. Moreover, the Court finds credible Patterson's testimony that because no additional filming would be required to conform those seven scenes to the May 7 screenplay, Filmline could have done so at no additional cost. As Patterson explained, Filmline had not yet begun post-production work when UA wrongfully terminated the agreement and the editing and voice-over work necessary to conform those scenes would not have exceeded normal budgetary limitations. *See id.* at 37–38, 40.

The Court finds, however, that Filmline would have had to reshoot the remaining four scenes to conform them to the May 7 screenplay. In accordance with Patterson's testimony, which the Court finds credible, Filmline could have reshot those four scenes in strict conformity with the May 7 screenplay in one day at an additional cost of $20,901.[24] *See id.* at 41; *see also* PXs 75, 76. Therefore, a reduction in plaintiffs' damages in the amount of $20,901 will put plaintiffs in the exact position they would have been in had UA not wrongfully terminated the agreement.

**23.** Defendant's witness, Wallace J. Samson, a production manager employed by MGM–United Artists, *see* Damages Tr. at 184, testified that it would be impossible to use voice-over work to conform any scenes to the May 7 screenplay. *See id.* at 188. According to Mr. Samson, the Picture was shot primarily in close-ups and, therefore, if the voice-over technique was used "[y]ou would end up with an Italian dump-type picture where the voice sync would not be in accordance with their facial movements or their expressions." *See id.* at 188; *see also id.* at 215–19.

Mr. Samson's testimony, however, was given in the context of discussing the much more difficult task of conforming the *entire* Picture to the May 7 screenplay. While the wholesale use of voice-over work might be difficult, the Court concludes that the limited voice-over work suggested by Mr. Patterson for those three scenes would have both been feasible and acceptable. Moreover, in determining that voice-over would not be feasible, Mr. Samson completely ignored the fact that many scenes were shot in more than one way and that certain scenes which were not in the final version could have been edited into the Picture. *See* Damages Tr. at 235,

**238.** The Court accepts as credible Mr. Patterson's testimony that voice-over would have been easy to do in many cases by using extra scenes not used in the final Picture which had less close-ups.

**24.** Mr. Patterson computed the cost of reshooting these scenes by using what he termed the "normal film budgeting technique." *See* Damages Tr. at 41. Pursuant to this technique, the cost of the cast, other personnel, and physical resources for each scene are added together to arrive at a total cost of reshooting. *See id.* The Court finds this technique to be an accurate measure of the true cost of reshooting.

The Court also notes that defendant's witness, Mr. Samson, did not offer any opinion as to the cost of reshooting these four scenes but instead only computed the cost of conforming the entire Picture to the May 7 screenplay. Moreover, the Court finds the normal film budgeting technique to be more accurate than Samson's method of merely prorating expenses from the original budget with no thought as to whether those expenses would actually be incurred in reshooting a particular scene. *Cf. id.* at 249, 250–51, 253–54, 259–60, 263, 266, 268, 274.

### E. *Pre-Judgment Interest*

 The plaintiffs are entitled to pre-judgment interest pursuant to N.Y.Civ. Prac.L. & R. ("CPLR") § 5001(a) (McKinney 1963). Because some of the items used in the total damage calculation, i.e., costs of production and distribution expenses, were incurred after UA breached the agreement, plaintiffs have argued that the Court should grant pre-judgment interest as of January 26, 1983, the date plaintiffs commenced the instant action. The Court agrees. *Cf.* CPLR § 5001(b); *Morse v. Swank, Inc.,* 520 F.Supp. 829, 829–30 (S.D. N.Y.1981), *aff'd sub nom. Morse v. S.A. R.L. DeGeshion Pierre Cardin,* 688 F.2d 816 (2d Cir.1982).

### CONCLUSION

On June 24, 1982, after six weeks of filming, UA sought to escape its contractual obligation to purchase and distribute the Picture on the pretext that the Picture was not shot in strict conformity with an alleged approved screenplay. At trial, however, UA switched its theory of the case and argued that Filmline's failure to revise the screenplay in accordance with the changes agreed upon at the April 17 meeting was the material breach which excused UA's performance obligations.

UA wrongfully terminated the agreement. Although Filmline breached its obligation to revise the screenplay in accordance with the changes agreed upon at the April 17 meeting, that breach occurred at the latest on May 11. Following that breach, however, UA elected to continue the contractual relations with Filmline rather than assert the breach. Having so elected, UA could not thereafter seek to terminate the agreement based upon that breach. Certainly UA could not, as it attempted to do in this case, seek to terminate based upon that breach six weeks later, when filming was almost completed.

Moreover, Filmline's failure to revise the screenplay during filming to Lippincott's satisfaction was not a contractual breach and, therefore, did not excuse UA's performance obligations. If UA was dissatisfied with the screenplay, UA's remedy was to assert that breach on or about May 11, the confirmed start date for filming. After May 11, UA had no contractual right to demand changes in the screenplay and, consequently, Filmline had no obligation to revise the screenplay during filming. In short, by electing to go on with the contractual relations for six more weeks despite Filmline's failure to properly revise the screenplay, UA assumed the risk that the screenplay would never be revised to their satisfaction, which is exactly what happened.

Plaintiffs have incurred $2,500,000 in direct damages resulting from defendant's wrongful termination. The plaintiffs, however, have received $289,210 in total net mitigation income, which sum must be subtracted from plaintiffs' total damage claim.

The Court rejects defendant's argument that plaintiffs' damages must be reduced by the amount it would have cost plaintiffs to reshoot the entire Picture in strict conformity with the May 7 screenplay. In awarding damages in a breach of contract case, the Court must seek to put the plaintiffs in the exact position they would have been in had no breach occurred. Had UA not wrongfully terminated the contract, UA would have and in good faith could have only required Filmline to conform to the May 7 screenplay the eleven scenes which Lippincott actually preferred in the May 7 version. This would have cost plaintiffs $20,901, which sum must also be subtracted from plaintiffs' total damage claim.

Therefore, plaintiffs are entitled to damages from the defendant in the amount of $2,189,889 plus pre-judgment interest on that amount from January 26, 1983. The parties shall submit to the Court an appropriate proposed judgment within two weeks of the date of this Opinion and Order.

It is SO ORDERED.