**APEX POOL EQUIPMENT CORP.,**
**Plaintiff-Appellant,**

v.

**Stephen C. LEE and The Paramount Corp., Defendants-Appellees.**

**No. 165, Docket 33508.**

United States Court of Appeals
Second Circuit.

Argued Oct. 28, 1969.

Decided Dec. 16, 1969.

Leon J. Greenspan, White Plains, N. Y. (Greenspan & Aurnou, Harold M. Miller, White Plains, N. Y., on the brief), for plaintiff-appellant.

Howard T. Owens, Jr., Bridgeport, Conn. (Owens & Schine, Robert J. Nicola, Bridgeport, Conn., on the brief), for defendants-appellees.

Before LUMBARD, Chief Judge, and MEDINA and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Plaintiff Apex Pool Equipment Corp. sued defendants Stephen C. Lee and The Paramount Corp., the former for breach of a covenant not to compete and the latter for interference with contractual relations between Apex and Lee. The covenant not to compete was part of a distributorship contract between Apex and Lee. The United States District Court for the District of Connecticut, Robert C. Zampano, J., after a non-jury trial, found that Lee was obliged to observe the covenant only if plaintiff Apex justifiably "terminated" the distributorship contract. The court held that while Lee had breached that contract in several respects, Apex had waived those breaches by the time it terminated the agreement, and the termination was therefore not justifiable. The court also found that since the covenant not to compete was not enforceable against Lee, there was no basis for Apex's action against Paramount. Apex appeals. We affirm.

## I.

Appellant Apex is a manufacturer of above-ground swimming pools.[1] On

---

1. For a description of appellant's pools, see Rains v. Niaqua, Inc., 406 F.2d 275 (2d Cir. 1969) (holding invalid a design patent).

March 15, 1965, John Rains, appellant's president, hired Lee to be Marketing Director and Vice President in charge of sales. Apparently this relationship did not work well, and in a few weeks it was changed. On April 2, 1965, Rains and Lee entered into the contract in suit, pursuant to which Lee became the exclusive distributor for Apex pools and equipment in Fairfield County, Connecticut. Under the contract, the relationship between Apex and "Distributor" [Lee] was that of "seller and purchaser," not "principal and agent," and Lee was to purchase pool "Paks," the minimum components of an installed pool. The contract further provided, in its most pertinent parts, as follows:

3. Distributor agrees to purchase (but shall not be liable for failure to purchase except to the extent of termination of this agreement at the option of Apex) pool equipment from Apex in Pak amounts in accordance with the following schedule:

| Year | Feb | Mar | Apr | May | June | July | Aug | Sept | Total 52 |
|------|-----|-----|-----|-----|------|------|-----|------|----------|
| 1965 |     |     | 5   | 10  | 25   | 25   | 10  |      | 75       |

[A739]

\* \* \* \* \* \*

4. The term of this agreement is from the date of acceptance by Apex to October 31, 1966.

5. This agreement shall be automatically renewed for a period of two years for the same quantity and type of pool and pool equipment agreed to be ordered by Distributor during the second year of this contract unless either party shall notify the other to the contrary in writing not less than 30 days prior to the expiration of this contract.

10. This agreement may be terminated by Distributor by written notice to Apex. \* \* \*

11. Apex may terminate this agreement at any time by written notice upon the occurrence of any of the following:

A. [Transfer of control over Distributor]

B. [Distributor's insolvency]

C. Upon the failure by the Distributor to meet its obligations under this agreement including, but not limited to, the performance schedule herein.

D. Upon the establishment of any branch office, sales telephone number, or display pool outside the distribution area set forth in this agreement.

E. Inadequate, improper or defective service of installation.

F. Failure of receipt by Apex of the deposit required by Paragraph 3 hereof on or before the date specified therein.

G. Failure of receipt by Apex of full payment for pools or pool equipment when due.

In addition to the specific reasons of termination set forth Apex shall have the right to terminate this agreement for any other reason which Apex may have as a matter of law arising out of any breach of this agreement or any default by the Distributor in performing any of the covenants in this agreement, and the Distributor irrevocably

consents to accept service of process by mail concerning any matter or claim arising hereunder.

13. This agreement shall be construed and enforced in accordance with the laws of the State of New York, and represents the entire agreement between the parties and may not be modified except by a writing executed by properly authorized officers of Apex and Distributor.

15. In the event of termination by either party of any reason, the Distributor covenants and agrees not to sell, advertise, install or otherwise promote any above ground wood frame pool or pool equipment other than that manufactured by Apex in the distributionship territory set forth in Paragraph 2 herein [Fairfield County] for a period of two years from such termination. The Distributor further agrees to return all Apex advertising and promotional materials within 10 days after termination.

It should be particularly noted that Paragraph 11 allowed Apex to terminate the agreement upon the occurrence of certain events, that Paragraph 15, which contained the covenant not to compete, is conditioned upon "the event of termination," and that the parties stipulated before Judge Zampano that the year 1965 in the schedule of purchases in Paragraph 3 should have been 1966.

Lee then began operations for the 1965 season as Fairfield County pool distributor, leasing space from Paramount. Lee did not meet his quota of 52 pools for the 1965 season, evidently in part because Fairfield County was suffering from drought, making sales difficult. He also bought less than the complete pool Pak from Apex in many of

the purchases that he did make, and evidently modified the pools he then sold in various ways.

In March 1966, on the eve of the 1966 season, the contract was modified in several respects not now relevant, except that they did not specifically deal with Lee's commitment to purchase specified numbers of pools.[2] As the 1966 pool season continued, "it soon became obvious," in the words of the district judge, that Lee would not fulfill his minimum quotas. While the record is not completely free from doubt on the point, and the district judge did not make any finding thereon, it appears that Lee bought from Apex ten pools in April, five pools in May, 22 pools in June, 17 pools in July and none in August.[3] Although relations between Rains and Lee had become somewhat strained, in September 1966 they entered into negotiations for a modification and an extension of the contract. Evidently, Rains felt that Lee should have been buying more equipment from Apex in the pool Paks that he did purchase, and was also somewhat disturbed about Lee's modifications of the pool design.

The negotiations were not fruitful: On September 28, Lee wrote Apex giving notice of non-renewal; subsequently, Apex wrote Lee to the same effect, although apparently negotiations for a possible new contract still continued. Finally, in a letter dated October 19, 1966, Apex said that it had no choice but to "terminate our contract * * * effective immediately, which we hereby do," and called Lee's attention to the obligations of the restrictive covenant. Lee denied that the covenant was effective; he purchased a half interest in Paramount some months later, and thereafter conducted a pool manufacturing and sales operation with Paramount. Apex brought suit in March 1968, seeking

2. E. g., henceforth Lee could take a 2% discount on all bills paid within 5 days of receipt and would purchase at least 50% of his pool Paks with filters.

3. As indicated above, the schedule called for 5 in April, 10 in May, 25 in June, 25 in July and 10 in August. The testimony of Lee indicated that certain pools were ordered in August, but evidently none was purchased.

both injunctive relief and damages. The former was waived by stipulation, and the case was tried on the issue of liability first. As indicated, Judge Zampano found for defendants on the ground that Apex had waived all of Lee's breaches, so that it had no right in October 1966 to "terminate" the contract under Paragraph 11 thereof; accordingly, the restrictive covenant never came into play.[4]

## II.

The first question before us is whether Apex had an absolute right to invoke Paragraph 15 of the contract, which contains the restrictive covenant. That paragraph begins as follows: "In the event of termination by either party of [for] any reason, the Distributor covenants * * * not to sell * * *." Appellant argues that this means that any end to the contractual relationship during its term would make the covenant effective and bind the distributor to its provisions. Appellees claim that "any reason" means any reason for which the contract gives Apex the express right to terminate. Judge Zampano stated that the "negative covenant" was enforceable "if the plaintiff terminated the contract for just cause" and saw the issue before him as whether Apex "had cause to terminate the distributorship." This adopted the essence of defendants' position, since it assumed that "termination" for "any reason" in Paragraph 15 meant termination for any "just" reason under the contract.

■ Appellant's reliance on the literal language of Paragraph 15 is, of course, understandable; "any reason" is broad.

But it is the meaning of the entire phrase "termination of [for] any reason" with which we are concerned. Since Apex is given the right to *terminate* the contract only for specified reasons, it can be said that its action in bringing the relationship to an end would not be termination at all, *as the word is used in the contract,* unless it was for one of the enumerated reasons. In other words, the meaning of the entire phrase in Paragraph 15 is colored by use of the concept of termination elsewhere in the contract. Thus, Paragraph 3 emphasizes Apex's right to terminate if Distributor fails to purchase. Similarly, Paragraph 11 defines the scope of Apex's right to terminate generally. The existence of a relationship between Paragraphs 11 and 15 is indicated not only by use of the same term but also by the nature of the events justifying termination in Paragraph 11; they may be described broadly as those situations in which a restrictive covenant would be reasonably necessary to protect the legitimate interest of Apex. Confining the restrictive covenant only to those circumstances seems fair and sensible. Reading it more broadly would give Apex an absolute right to bar Lee, who had considerable experience in the field, from selling swimming pools in Fairfield County for two years even though this was unnecessary to a fair bargain. The New York cases, as well as those elsewhere,[5] favor a narrow construction, although appellant seeks to distinguish most on their facts.[6] Of course, those cases are not identical with this one, and it is true that most of the New York decisions on this point—although

---

4. The judge also dismissed a counterclaim by defendants based on a theory of "vexatious suit." Defendants do not appeal from that determination.

5. See generally, Blake, Preventing Competition by a Former Employee, 73 Harv. L.Rev. 625 (1960). The parties agree that it was proper for Judge Zampano to apply New York law in accordance with Paragraph 13 of the contract.

6. E. g., Cornell v. T. V. Development Corp., 17 N.Y.2d 69, 268 N.Y.S.2d 29, 215 N.E.2d 349 (1966) (General Manager); Millet v. Slocum, 4 A.D.2d 528, 167 N.Y.S.2d 136 (App.Div. 4th Dep't 1957), aff'd, 5 N.Y.2d 734, 177 N.Y.S.2d 716, 152 N.E.2d 672 (1958) (physician in partnership); I. Edward Brown, Inc. v. Astor Supply Co., 4 A.D.2d 177, 164 N.Y.S.2d 107 (App.Div. 1st Dep't 1957) (salesman).

not all [7]—involved employees, while Lee was technically an independent "Distributor." Nevertheless, it seems clear that the tendency in New York is to give the covenantee in this situation no more protection than necessary and does not favor a finding of absolute right to invoke the restrictive covenant. That trend should hardly be disregarded when, as here, the party seeking to apply the covenant drafted it. We do not say that we would reject the result Apex seeks if it were apparent that the parties had bound themselves to it, particularly since Judge Zampano found the restrictive covenant otherwise reasonable. But the agreement is not that clear; if anything, it favors Lee's position rather than that of Apex. In any event, in our interpretation of the contract,[8] we come out at the same point as Judge Zampano did.[9]

### III.

Appellant argues that even if Paragraph 15 of the contract is so limited, Lee did breach his agreement; therefore, Apex's "termination" on October 19, 1966 was proper and made the restrictive covenant effective. Judge Zampano concluded that there were a number of breaches by Lee, but found that they were immaterial (or "minor")[10] or waived. In its brief in this court, Apex attacks only the finding that it waived Lee's breach of the minimum pool purchase requirement in 1966. As to that, the judge stated:

Under the contract, Lee agreed to purchase 52 pools in 1965 and 75 in 1966. His actual purchases of 35 pools and 54 pools in the years in question were material breaches of the agreement, entitling the plaintiff to terminate the relationship. However, it is a settled principle of contract law that a party to an executory bilateral contract waives a material breach by the other party if he continues the business relationship, and accepts future performance without some warning that the contract is at an end. * * * Here Rains knew that Lee's purchases fell short of the mark in 1965; yet, he failed to rescind and expressly accepted Lee's excuses that it was a "drought year." In 1966 Lee was on a monthly quota and it soon became obvious that he was not going to buy the required amounts. Despite this obvious failure to meet the quota, Rains not only continued the business relationship but entered into negotiations for renewal of the contract. It was after negotiations failed that Rains, as an afterthought, terminated the contract and attempted to justify termination by relying on breaches he had acquiesced in long before. Under these circumstances, plaintiff waived the breach. [Citations omitted.]

---

7. E. g., Millet v. Slocum, *supra*, note 6; Dictograph Prods. Co. v. Morris, 54 N.Y. S.2d 211 (Sup.Ct., N.Y.Co.1945) (distributor).

8. See Farnsworth, "Meaning" in the Law of Contracts, 76 Yale L.J. 939 (1967), for an illuminating discussion of the general problem.

9. We are aware that the New York Uniform Commercial Code (McKinney's 1964) [hereinafter UCC], to which neither party cited us, governs this contract, or at least those portions of it which deal with the sale of pools, and that UCC § 2-106 defines "termination" as occurring when a party exercises a power to end a contract "otherwise than for its breach." This is opposed to the

Code's definition of "cancellation," when a party ends a contract "for breach by the other." At first blush, this appears to support appellant's position that "termination" in Paragraph 15 is not keyed to breach of contract. However, it is clear to us that the parties did not have the Code definition in mind, but rather viewed Paragraph 15 as tied to Paragraph 11. Attributing a different meaning to their language would be foreign to the spirit of the Code. See UCC § 1-102(3).

10. E. g., taking the 2% discount when payment was made within 10 days of shipment rather than 5; buying only 26 filters in 1966, one less than the agreement required. See note 2 *supra*.

In reviewing these findings, it is important to analyze precisely both Lee's covenant not to compete and Apex's right to terminate the contract. The former is a conditional promise—conditioned on a justifiable termination by Apex. The latter merely makes explicit what is implied in many contracts—a party can terminate his own contractual duties as a response to material breach on the part of the other contracting party. In other words, Apex's duties under the contract, e. g., to refrain from furnishing pools to other distributors in the area and to sell pools to Lee, were conditioned on performance by Lee. If there was a "breach" of this condition by a material breach of the contract, Apex had the right to terminate the relationship.

■ But it is equally true that such a right may be lost under New York law. Put more accurately, the power to terminate a continuing contract because of a particular breach of that contract is a power of election. As the New York Court of Appeals noted in *Emigrant Industrial Savings Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 145, 48 N.E.2d 293, 299 (1943):

"Where a contract is broken in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on." 3 Williston on the Law of Contracts, Rev.Ed., § 683. If the injured party chooses to go on, he loses his right to terminate the contract because of the default. See Restatement of the Law of Contracts, § 309. There can be, then, no question of consideration. In this case the failure of the plaintiff to object to the assignments or orders for payment of moneys to become due, coupled with the continuation of discussions by the plaintiff and defendant of possible increase of the building loan, and other acts of the plaintiff showing that the plaintiff considered the contract still in existence, is compelling evidence of choice by the plaintiff to continue the contract. Without explanation or contradiction of this evidence the plaintiff cannot thereafter elect to foreclose its mortgage for a default which apparently it chose to disregard as a ground for termination of the contract.

The section of the Restatement referred to above gives an example remarkably similar to the instant case, assuming that A in the following illustration is Apex. Restatement of Contracts, § 309, Comment d, illustration 2:

A agrees to sell and B to buy all the flour B needs in his business during the year, provided B orders at least 250 barrels each month. B fails to order any flour the third month. The fourth month B orders 400 barrels. A fills the order. A is bound to continue performance thereafter.

The right to terminate in the face of a breach is only an option to declare the contract at an end; if the contract is continued, the party doing so has not, strictly speaking, "waived" his right but has executed it in favor of continued contractual relations. However, deciding to continue a contract despite a breach does not necessarily foreclose future terminations if there are succeeding breaches, *id.*, illustration 3, although under certain circumstances it may. See, e. g., *id.* at § 300. Moreover, contrary to appellant's argument, election in this context does not depend upon an intention to surrender a right; the point is that "The law simply does not, under the circumstances, permit a party to exercise two alternative or inconsistent rights or remedies," 5 Williston, Contracts, § 684 (Rev. ed. 1961). Nor is it necessary to the binding character of such an election that the other party rely thereon to his detriment. It is enough to show that the electing party has continued to accept benefits under the contract. *Id.* at §§ 687, 688.

Turning now to the facts before us, it is clear that Apex, faced with Lee's failure in 1965 to purchase his quota of 52 pools, i. e., his breach, elected to continue to receive performance from Lee in 1966, thus affirming the contract. As

already noted, this is what Judge Zampano found and Apex does not contest that finding here. What Apex does urge most vigorously is that it made no similar election to ignore the quota breach in 1966. Indeed, Apex argues that it was not until October 1, 1966 that Lee became incapable of making the required purchases to meet the annual quota, and that no conduct on Apex's part from October 1 to October 19 justified a finding of "waiver."

The short answer to this is that the district court, albeit in passing, appears to have found that the quota in 1966 was not yearly, but monthly. Certainly the contract was ambiguous on this point, but the insertion of monthly quotas for 1966 and the complete absence of them from 1965 could justify this interpretation. Moreover, when Lee fell short of his monthly quota for June and July, Apex failed to give him any indication that he had to make up that difference of 11 pools and buy them in September, when the season was over for all practical purposes. Under the sensible principles of UCC § 2–208, this would be almost conclusive against interpreting the contract as Apex suggests.[11]

Assuming, then, that the 1966 portion of the contract called for Lee only to meet monthly quotas as they arose, there were possible breaches by Lee as to June, July and August. As to the first two, Apex made clear by its conduct that it was choosing to go on with the contract, expecting Lee to perform in the succeeding months. Accordingly, under the principles discussed above, it could not then decide in October to "terminate" for these earlier breaches. However, the situation with the August quota of ten pools was different. This was the last monthly quota under the

contract; unlike Apex's position in the earlier months, it was not called upon in September and October to choose between performing in response to new monthly orders or terminating for the breach just past. The negotiations which Apex conducted with Lee, unlike those mentioned in *Emigrant Industrial Savings Bank, supra*, were not an affirmance of the contractual obligation, but sought more favorable terms for Apex in a new contract.

The real question is whether, at the time Apex terminated the contract, Lee could properly be said to have already breached it because of failure to meet the August quota; if not, then termination was improper. The contract is not explicit as to percisely when each monthly quota is to be met. Originally, it provided in Paragraph 3 for payment of a $25 deposit per pool Pak by "the first day of the first calendar month for which a quota is entered," but this was eliminated in a March 1966 modification.[12] Assuming that the purchase of the quota for the month was to be made by the end of the month, Apex paid little attention to the time of purchase as such. Certainly its conduct as to the June and July quotas indicated that the time or rate of performance was waived. Such a waiver was doubtless retractable, see UCC § 2–209(5), but that required "reasonable notification received by [Lee] that strict performance will be required" in the future. This was never done. The net result, as we see it, is that in September or October Apex might well have been able to require performance from Lee as to the August pools had Apex chosen to do so properly. However, at a time when the pool season was over (October 19), it could not suddenly declare Lee in breach with-

11. UCC § 2–208 provides, in relevant part:
(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

12. This provided that:
Purchase order of five pool paks to be shipped on or before the week of April 5, 1966, in lieu of deposits for 1966.

out such notice, "terminate" the contract and thus activate the restrictive covenant. Accordingly, here too we come out at the same place that Judge Zampano did. Indeed, we agree with his observation that the October 19 termination by Apex was "an afterthought," after negotiations had failed.

To sum up: Since Apex terminated the contract unjustifiably, the condition on the covenant by Lee not to compete was never met and his promise never came into force. Therefore, he had no further duty to Apex, and was free to compete.[13] Since there was no contract between the parties when the relation with Paramount was entered into, there was no opportunity to interfere with the contractual relations between Lee and Apex.

Judgment affirmed.

---

13. As indicated, Apex has concentrated before us on Lee's breach of the minimum pool purchase requirements. Were it necessary to rule on Judge Zampano's conclusion that the other breaches were either similarly "waived" or were "minor," we would agree.