**In re NEMKO, INC., Debtor.**

**NEMKO, INC., Debtor–in–Possession, Plaintiff,**

v.

**MOTOROLA, INC. and Motorola Communications and Electronics, Inc., Defendant.**

**Bankruptcy No. 190–11025–260. Adv. No. 192–1140–260.**

United States Bankruptcy Court, E.D. New York.

Feb. 18, 1994.

Tenzer, Greenblatt, Fallon & Kaplan, New York City, for plaintiff; Leonard D. Steinman and Lawrence M. Rosenstock, of counsel.

Kirkland & Ellis, New York City, for defendant; Terrence J. Galligan, of counsel.

DECISION ON WHETHER TERMINATION OF ALLEGED EXECUTORY CONTRACT CONSTITUTED BREACH OF CONTRACT AND VIOLATED DEBTOR'S RIGHTS UNDER SECTION 365(e)(1) OF THE BANKRUPTCY CODE

CONRAD B. DUBERSTEIN, Chief Judge.

In this adversary proceeding, the Debtor ("Debtor" or "Nemko") seeks damages in the amount of $500,000 for cancellation of a contract it contends it entered into with the Defendant Motorola Communications and Electronics, Inc. ("Motorola"), which cancellation was in violation of 11 U.S.C. § 365(e)(1) [1], and for breach of that contract. After denial of the Defendants' motion to dismiss the Complaint, the parties proceeded to trial to determine (a) whether a contract had been entered into, (b) the nature of the contract, and (c) whether the contract was breached, or cancelled in violation of section 365(e) by Motorola. For the reasons hereinafter set forth, the Complaint is dismissed.

### The Nature of the Debtor's Business

The Debtor is a corporation duly organized under the laws of New Jersey, and was at all pertinent times authorized to conduct business in New York. It specialized in providing manpower and engineering services, particularly in performing work on vehicles for the Transit Authority of the City of New York (TA), in space Nemko leased at the Brooklyn Navy Yard.

### THE PROCEEDINGS BEFORE THIS COURT

On March 19, 1990, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. It continued in the operation and management of its business as a debtor-in-possession as late as 1992, when it ceased operations.

In March of 1992, the Debtor commenced the instant adversary proceeding against Motorola and its parent Motorola Inc. claiming that Motorola unilaterally terminated certain purchase orders it placed with the Debtor, which in effect, constituted a breach of an alleged "overall agreement" reached between it and the Debtor, and which violated the aforesaid provisions of section 365(e). The Debtor further asserts that pursuant to the alleged "overall agreement," it would lease certain portions of its premises at the Brooklyn Navy Yard to Motorola in exchange for Motorola's awarding it lucrative subcontracts related to a contract Motorola had with the TA.

In opposition to the relief sought by the Debtor, Motorola maintains that the "overall agreement" between it and the Debtor never existed. Motorola contends that two specific purchase orders it placed with the Debtor on March 9, 1990 ("inspection/removal purchase order(s)") merely constituted offers that were effectively cancelled by Motorola prepetition and before the Debtor ever accepted them. Thus, it claims section 365(e) was not violated. Finally, although Motorola admits that one purchase order it placed with the Debtor on March 7, 1990 ("antennae assembly purchase order") did evidence an executory contract, it contends that the Debtor materially breached that contract prepetition and therefore it did not exist at the time the Debtor filed its petition for relief.

On April 21, 1992, Motorola and Motorola Inc. moved to dismiss the Debtor's Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to adversary proceedings through Rule 7012 of the Federal Rules of Bankruptcy Procedure ("Rule(s)"). Prior to deciding the motion, this Court held evidentiary hearings in August and September of

---

1. All section references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., unless the context otherwise indicates.

 Section 365(e)(1) provides in pertinent part: [A]n executory contract ... of the debtor may not be terminated ... and any right or obligation under such contract ... may not be terminated ... at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

 (B) the commencement of a case under this title

11 U.S.C. § 365(e)(1)(B) (1993).

1992 to determine whether or not a contract existed between the Debtor and Motorola. The Defendants' Rule 7012 motion to dismiss the Complaint was denied by this Court at the conclusion of the hearings, this Court having deemed that the evidentiary hearings constituted a trial, at the conclusion of which this Court reserved its decision with respect to the Debtor's Complaint.

## FACTS

On or around October 1, 1988, Motorola was awarded an installation services contract by the TA. Under the contract, Motorola was to remove old mobile communication systems, and inspect and install new mobile communications systems in 3,817 buses and 302 other vehicles. In addition, the contract required Motorola to perform the work within three (3) miles of the TA's East New York command center. At that time, and prior thereto, pursuant to its own contracts with the TA, Nemko was performing work on TA buses.

In anticipation of receiving the TA contract, Motorola began searching for areas within the three mile limit during the summer of 1988. It found the space the Debtor was leasing at the Brooklyn Navy Yard to be an ideal location to conduct its operations. The Brooklyn Navy Yard was located within the requisite three mile limit, and its massive physical characteristics provided adequate office space that was conducive to the performance of transit vehicle retrofit work.

Upon learning of Motorola's interest in the property, Dino Catozzo, Vice President of the Debtor, met with Charles Montrose, a representative of Motorola, in the summer of 1988. The Debtor was eager to please Motorola. Lurking behind the Debtor's interest in leasing the premises to Motorola was the anticipation of Motorola's awarding it lucrative subcontracts relating to Motorola's contract with the TA. Therefore, a second meeting was scheduled. The Debtor contends that at this meeting an "overall agreement" between it and Motorola was reached.

The Debtor sent a letter dated September 19, 1988 to Motorola quoting prices for the lease of certain office space on the Debtor's premises. Notably, the prices were condi-tioned upon "Nemko receiving a letter of intent for contract negotiations [with Nemko] for the bus radio installation project." Letter from Gary Bousquet of Nemko to Renee Link of Motorola (September 19, 1988).

Subsequently, Motorola sent a letter to the Debtor dated October 14, 1988, which stated in pertinent part:

> This is to confirm that Motorola C & E intends to enter into a contract with Nemko Inc. for the following work subject to [TA] approval of Nemko as a subcontractor under [TA] contract G–32299: The installation of mobile radio's [sic] and associated wiring/equipment, in approximately 3817 buses and 302 non-revenue vehicles.

Letter from Joseph D. Vandermark of Motorola to Gary Bousquet of Nemko (October 14, 1988).

A dispute exists between the parties as to the reason for the October 14, 1988 letter. The Debtor insists that the letter was sent in response to its September 19, 1988 request for a letter of intent. However, Motorola asserts that the letter was sent because the TA required such a letter in order to initiate the process of approving the Debtor as a subcontractor.

On November 14, 1988, Motorola sent a letter to the New York State Department of Economic Development, which stated in pertinent part as follows:

> The combination of [Nemko's] history of successfully completed projects, sound management, stringent quality control, extensive employment of local minorities, reasonable cost and fortuitous location led us to decide to award [Nemko] a substantial share of the activities associated with the project:
> 
> —Subject to [TA] approval, Nemko will be contracted to install and test the mobile radios in all vehicles.

Letter from J. Ruscigno of Motorola to Raymond Gillen of the New York State Department of Economic Development (November 14, 1988).

Motorola began subleasing office space from the Debtor in December 1988 for $3,175 per month. During 1989, a step-by-step de-

scription of the work at issue was prepared, and in July 1989 Motorola subleased additional space from the Debtor in order to store forty (40) buses. The sublease was for a period of twenty-three (23) months commencing on August 1, 1989, and expiring on June 30, 1991, at a monthly rental of $41,013 inclusive of insurance and security. The rent charged by the Debtor pursuant to this sublease was twice that which it was paying for the space commencing July 1989. An integration clause in the sublease provided as follows:

> This Agreement constitutes the entire agreement of the parties and shall supersede all prior offers, negotiations and agreements, oral or written, and all other communications between the parties relating to the subject matter of this Agreement. This Agreement cannot be amended, extended or modified except by a writing executed by the parties hereto and approved by [Brooklyn Navy Yard Development Corporation].

On several occasions in 1989, Motorola asked the Debtor to provide various services related to the TA contract. These services, which included providing employees to perform mobile electronic tests, unloading trucks, and acting as temporary site managers, were performed by the Debtor pursuant to purchase orders executed by Motorola. The Debtor claims that these purchase orders simply confirmed prior oral agreements between the parties for such performance. In essence, the Debtor asserts that each purchase order constituted an executory contract between it and Motorola. This Court pauses to note the Debtor's assertion is made in light of its other assertion that an underlying oral "overall agreement" existed between the parties.

Motorola adamantly disputes the Debtor's characterization of the purchase orders as executory contracts. Instead, Motorola asserts that only some "minor" services to be performed were orally agreed to prior to the issuance of purchase orders. Absent the prior oral agreement, it characterizes the purchase orders as mere offers which could be cancelled by Motorola, at any time, pursuant to the general termination clause contained on each purchase order. According to Motorola, when major services were to be performed by the Debtor, the purchase orders would constitute the only agreement between the parties. Motorola maintains, however, that when a purchase order did in fact constitute a confirmation of a prior oral agreement, the purchase order would contain an "x" marked in a box labeled "confirming order do not duplicate." An examination of the inspection/removal purchase orders reveals a dispute regarding the check marks in the boxes relating to the existence of a prior oral agreement, as hereinafter discussed.

On or about January 15, 1990, and again on or about February 22, 1990, the Debtor provided Motorola with three (3) detailed bids/quotes for work relating to the TA contract, one dated January 15, 1990, and the other two dated February 22, 1990. The Debtor indicated that it was willing to submit to a time study of its performance and price, as one of the February 22, 1990 price quotes indicated:

> Please note that Nemko is willing to revise its quotation based on a time study of the first 100 (One Hundred) units. This will guarantee MOTOROLA a truly competitive price determined under actual and not just estimated conditions.

Letter from Guy Monaco to J. Ruscigno (February 22, 1990).

The Debtor alleges that on February 27, 1990, a meeting took place between it and Motorola at which both parties orally agreed that the Debtor would provide: (1) the inspection and preparation work; (2) traffic control; and where appropriate (3) the removal of existing radio equipment on 1,900 buses. The Debtor claims that this meeting finalized the earlier "overall agreement" reached at the meeting in the summer of 1988 between the Debtor and Motorola regarding the lease and subcontracting work. The Debtor contends that the only difference between this "agreement" and the original "agreement" was that the Debtor would no longer be able to perform the actual radio equipment installation work because this work had to be given to a union contractor. However, Motorola asserts that the Debtor was apprised of its ineligibility to perform

the actual installation work due to its non-union status prior to the submission of its bids. In fact, Motorola does not even recall attending the purported February 27th, 1990 meeting. Moreover, it has already been noted that Motorola unequivocally denies ever entering into any "overall agreement" with the Debtor.

Throughout its relationship with the Debtor, Motorola entertained bids from several potential subcontractors, including the Debtor, for performance of work required by its TA contract. Motorola maintains that it was not satisfied with the bids submitted by any of the potential subcontractors, not even the Debtor's. Nevertheless, Motorola intended to give the Debtor an opportunity to demonstrate what it could accomplish. Consequently, Motorola decided not to award an "overall" subcontract for the inspection and removal work, but instead began to issue purchase orders to the Debtor for only 300 of the 1,900 buses covered in Phase I of the TA contract. According to Motorola, the TA contract was divided into two phases. Phase I of the contract was for 1900 buses. The remaining 1917 buses would be serviced under Phase II of the contract, which a purchase order issued March 9, 1990 states "will be put out for bid after the completion of Phase I installation." The Debtor intimates that the work was not always divided into two phases, and that this division was created by Motorola itself. Motorola asserts that its position is supported by its request in certain purchase orders for a time study report that would be used to develop a new price for the remaining buses in Phase I.

On March 7, 1990, Motorola issued to the Debtor the antennae assembly purchase which requested that the Debtor provide antenna assemblies for the buses under the TA contract. The purchase order provided a price of $33 per assembly with a total price of $33,000 for 1,000 assemblies. The purchase order required that 100 assemblies be delivered on March 12, 1990, and 100 per week thereafter. A typewritten "x" appeared in the "confirming order" box on the purchase order, which according to both Motorola and the Debtor, confirmed a prior oral agreement.

On March 9, 1990, Motorola forwarded the inspection/removal purchase orders to the Debtor. The first inspection/removal purchase order solicited inspection, traffic control, and preparation of 300 buses for installation. It further required the Debtor to perform a time study on the final seventy five (75) buses to determine the actual time needed to perform the work. The time study was to be used to develop a new price for the 1600 buses remaining under Phase I of the TA contract.

The second inspection/removal purchase order issued by Motorola solicited the removal of existing radio equipment on those buses having such equipment. Notably, this purchase order was also limited to 300 buses, of which only sixty (60) percent actually contained old radio equipment that needed to be removed.

Copies of the inspection/removal purchase orders held by the Debtor contained a handwritten "x" in the box labeled "confirming order." However, the copies of inspection/removal purchase orders that were retained in Motorola's files did not have an "x" marked in the "confirming order" box. The Debtor maintains that whether or not the "confirming order" box was checked is irrelevant, because the parties reached a binding "overall agreement" in the summer of 1988, and confirmed it at the February 27, 1990 meeting. As previously stated, Motorola unequivocally denies the existence of any prior agreement.

The reverse sides of all the purchase orders issued by Motorola to the Debtor contain the following language:

ACCEPTANCE. This purchase order is an offer by [Motorola] to the Seller which will become a binding contract on the terms and conditions contained on both sides of this purchase order when it is accepted by the Seller. The Seller may accept by shipping against this purchase order or by sending to [Motorola], the Seller's own acknowledgement form.

The reverse sides also contain a general termination clause, which reads as follows:

TERMINATION. Motorola shall have the right to terminate this order ... by

giving Seller written notice of its election to do so by mail or telegraph.... [I]n the event of such termination Motorola agrees to pay Seller ... all costs necessarily incurred by Seller in the performance of this order which are properly allocable under recognized commercial accounting practices to the cancelled portion of this order. Any claim for payment of such additional costs incurred by the Seller must be submitted in writing to Motorola within thirty (30) days of receipt of written notice of termination....

On Friday March 16, 1990, Motorola learned that the Debtor would be filing for bankruptcy. The very same day, in response to this news, Motorola delivered a letter to the Debtor that cancelled the two inspection/removal purchase orders. According to Motorola, this termination is permitted by the language printed on the reverse sides of the purchase orders which permitted Motorola to terminate the order at any time, without any reason, provided that Motorola pay reliance damages. As previously noted, Motorola contends that the two inspection/removal purchase orders were merely offers that Motorola cancelled prepetition and before the Debtor accepted them.

On April 4, 1990, subsequent to the filing of the Debtor's Chapter 11 petition, Motorola cancelled the antennae assembly purchase order. Although it is undisputed that this purchase order was an executory contract, the Debtor never abided by the terms of that contract which required it to deliver the first 100 assemblies on March 12, 1990, and 100 per week thereafter. In fact, the Debtor never furnished any assemblies.

The Debtor boldly suggests that its "course of conduct" with Motorola over a two year period evidenced a binding executory contract between the parties, and argues that the "overall agreement" provided Motorola a lease for premises in an ideal location in exchange for Motorola's awarding of lucrative subcontracts to the Debtor. It further maintains that Motorola's unilateral termination of certain aspects of the purported "agreement" not only constituted a breach of a binding executory contract, but also that Motorola's cancellation of the inspection/removal purchase orders by reason of the Debtor's filing for bankruptcy violated the spirit of section 365(e).

## ISSUE

The issue to be determined in this adversary proceeding is whether or not an "overall agreement" was reached between the Debtor and Motorola, and if such "agreement" was reached, did it constitute an executory contract which Motorola breached and cancelled pursuant to clauses rendered unenforceable in bankruptcy by section 365(e).

## ANALYSIS

### The Overall Agreement

The Court finds that there does not exist any writing that independently embodies the "overall agreement" upon which the Debtor relies, nor is there any mention of an executory contract with Motorola in its Statement of Affairs and Statement of Executory Contracts filed with this Court as required by Rule 1007(b)(1). Furthermore, the Debtor did not move to assume or reject any executory contract pursuant to section 365(a) [2], nor make the slightest attempt to cure any prepetition defaults pursuant to section 365(b) [3].

Generally, section 365 affords the Debtor, *inter alia*, the opportunity to assume or reject existing executory contracts to which the debtor is a party when the debtor files its petition for bankruptcy. The option to assume or reject an executory contract is important to the primary goal of reorganization, and thus enables a debtor to restructure its business to enable it to continue in its opera-

---

**2.** Section 365(a) reads: "[T]he trustee, subject to the court's approval, may assume or reject any executory contract ... of the debtor." 11 U.S.C. § 365(a) (1993).

**3.** Section 365(b) reads in pertinent part:
(1) If there has been a default in an executory contract ... the trustee may not assume such

contract ... unless, at the time of the assumption of such contract ... the trustee—
(A) cures, or provides adequate assurance that the trustee will promptly cure, such default....
11 U.S.C. § 365(b)(1)(A) (1993).

tion. *South Chicago Disposal, Inc. v. LTV Steel Co. (In re Chateaugay)*, 130 B.R. 162, 167 (Bankr.S.D.N.Y.1991). In addition, section 365(e)(1) provides in pertinent part that "[a]n executory contract ... may not be terminated or modified ... at any time *after* the commencement of the [bankruptcy] case solely because of a provision in such contract ... that is conditioned on ... (B) the commencement of a case under this title...." 11 U.S.C. § 365(e) (1993) (emphasis added).

This Court is fully cognizant of the importance of the overall provisions of section 365 to Chapter 11 debtors faced with precarious financial circumstances and slim chances of successful reorganization. In some cases, as in the instant case, a claim or right arising under section 365 may be the only significant asset remaining in the debtor's estate. Nevertheless, this Court cannot overlook the plain meaning and purport of the section, nor the Debtor's dormancy in exercising its rights under the section, in an effort to rescue it from the throes of an otherwise inevitable liquidation.

■ Generally, in order for section 365 to be applicable, the Code mandates the existence of an executory contract on the day the debtor files its petition for relief. *See HY— Test, Inc. v. New England Safety Shoe Corp. (In re Interco)*, 135 B.R. 634, 635 (Bankr. E.D.Mo.1992). The Debtor asserts that an "overall agreement" existed on the day it filed its petition, between it and Motorola, requiring Motorola to award the Debtor lucrative subcontracts in return for leasing Motorola a prime location in the Brooklyn Navy Yard. The Debtor invites this Court to recognize this unwritten agreement as an executory contract by considering the course of conduct between the parties. This Court notes, however, "[c]ourse of dealings between the parties is a tool for interpreting existing contracts and may not be used to establish contract formation." *Fasolino Foods Co. v. Banca Nazionale Del Lavoro*, 761 F.Supp. 1010, 1021 (S.D.N.Y.1991), *aff'd*, 961 F.2d 1052 (2d Cir.1992).

■ After a thorough review of the course of conduct between the Debtor and Motorola, this Court not only recognizes, but also applauds the prepetition business relationship and accord cultivated by Nemko with Motorola. Nevertheless, business relationships, agreements and arrangements, other than executory contracts and leases, are simply not within the purview of section 365. In the case at bar, the facts clearly suggest that an "overall agreement" of the magnitude suggested by the Debtor was never reached. At best, the Debtor's assertion that an "overall agreement" between the parties existed is an overstatement. Indeed, Motorola and Nemko both benefitted from their symbiotic relationship, and throughout their "course of conduct," valid individual agreements were negotiated for the performance of various services. For this reason, this Court individually examined all the written agreements between the parties in an effort to protect all the rights of the ailing Debtor. Nevertheless, we decline the invitation to "create" a valuable "overall" executory contract from a set of facts which reveal nothing more than an enterprising local corporation romancing a much larger, more sophisticated corporation, in anticipation of being awarded lucrative subcontracts.[4]

■ Furthermore, an in-depth analysis of the facts of this case reveals conduct completely inconsistent with the Debtor's claim that an "overall agreement" actually existed. For example, the Debtor actually submitted bids for subcontracting work nearly two years *after* the purported "overall agreement" had been reached. In addition, the Debtor's willingness to bid for the subcontracting work suggests that an "overall agreement" was never reached. In fact, Motorola had indicated in writing that the prices quoted by the Debtor for the performance of subcontracting work were unacceptable. The Debtor therefore agreed to a time study to examine the feasibility of the Debtor's

---

4. This Court pauses to note the unfortunate circumstances occurring subsequent to the Debtor's filing its petition for relief. The day after the Debtor filed its petition, Motorola hired the Debtor's former employees to perform the very same work. This postpetition action by Motorola undoubtedly contributed to the Debtor's level of frustration, and this Court is genuinely sympathetic to Chapter 11 debtors situated in such business relationships gone sour.

quoted prices and performance. Without such basic terms as price or specifications, any oral "overall agreement" that may have been reached in 1988 would be too indefinite to be enforced. *See Joseph Martin, Jr. Delicatessen v. Schumacher*, 52 N.Y.2d 105, 109, 417 N.E.2d 541, 543, 436 N.Y.S.2d 247, 249 (1981) ("[B]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained.").

■ At the very least, any arrangement between the Debtor and Motorola was subject to further negotiation, and lacked the "meeting of the minds" requisite to the existence of an enforceable contract. *See Aces Mechanical Corp. v. Cohen Bros. Realty & Constr. Corp.*, 136 A.D.2d 503, 505, 523 N.Y.S.2d 824, 827 (1st Dep't 1988). It is highly improbable that Nemko would submit bids and agree to a time study if a binding agreement had, in fact, already existed. Moreover, it is abundantly clear to this Court that an enforceable "overall agreement" requiring Motorola to award the Debtor subcontracts pursuant to its contract with the New York City Transit Authority was never reached. Because an "overall agreement" between the parties was never reached, an "overall" executory contract between the Debtor and Motorola did not exist on the day the Debtor filed its petition in bankruptcy. Finally, the Debtor's failure to move this Court to assume or reject this "overall agreement" under section 365(a) and its failure to make an attempt to cure its defaults pursuant to its rights under section 365(b), cast serious aspersions on the Debtor's contention that any executory agreement existed at the time of its filing for bankruptcy. Hence, any section 365 claim by the Debtor regarding an "overall executory contract" is hereby rejected.

### The "Individual Agreements"

In recognition of the gravity of any violation of the Debtor's rights under section 365, this Court will sequentially examine the documents referenced in the Debtor's Complaint as to determine the existence and implications of "individual" agreements between the Debtor and Motorola.

### 1. The Lease Agreements

■ The validity of both the December 1988 and July 1989 leases between the Debtor and Motorola are undisputed, and their terms are clear. Nevertheless, the Debtor contends that its lease agreements with Motorola were executed in exchange for Motorola's awarding of lucrative subcontracts to the Debtor. This Court rejects the Debtor's contention. The December 1988 and July 1989 leases fail to make the slightest reference to any such exchange. In fact, as previously mentioned, the July 1989 lease clearly indicates that it represents the entire agreement of the parties and supersedes all prior agreements. This Court also notes that Motorola continued to lease the premises from the Debtor subsequent to its filing for bankruptcy.

■ Even if the parties had previously reached a prior oral "overall agreement" providing an exchange of the lease for subcontracts, "[w]hen the parties to a contract enter into a new agreement that expressly supersedes the previous agreement, the previous agreement is extinguished...." *Health–Chem Corp. v. Baker*, 915 F.2d 805, 811 (2d Cir.1990). In addition, the parol evidence rule prohibits proof of an oral agreement to add to or vary a writing where a written contract was intended to embody the entire agreement. *Fogelson v. Rackfay Constr. Co.*, 300 N.Y. 334, 338, 90 N.E.2d 881, 884 (1950). Nevertheless, evidence of a prior collateral agreement is allowed if at least two conditions are met: "[I]t must not contradict express or implied provisions of the written contract; ... it must be one that parties would not ordinarily be expected to embody in the writing." *Cowper Co. v. CDC–Troy, Inc.*, 50 A.D.2d 1076, 1076, 376 N.Y.S.2d 754, 757. (4th Dep't 1975) (quoting *Mitchill v. Lath*, 247 N.Y. 377, 380–81, 160 N.E. 646, 647 (1928)). The Debtor fails to meet the second condition. An overall agreement of the magnitude suggested by the Debtor would ordinarily be expected to be embodied in the writing. In addition, the Debtor contends that because it was not in the business of leasing space, it would not have leased space to Motorola absent the "overall agreement"

regarding the awarding of subcontracts. In effect, the Debtor's argument supports the proposition that any "agreement" regarding the subcontracts would likely be reduced to a writing. Under the facts of this case, an agreement to award a multi-million dollar subcontract is clearly a collateral agreement that the parties would ordinarily reduce to a writing. Hence, even if an oral "overall agreement" did exist, it is unlikely that this Court would entertain its introduction into evidence, in light of the absence of its mention in the fully integrated, written lease agreement.

## 2. The Letters of Intent

In support of the Debtor's argument that it entered into a binding "overall agreement" with Motorola sometime in 1988, the Debtor refers to two letters sent by Motorola to the Debtor dated September 19, 1988 and October 14, 1988 which have been referenced earlier in this opinion.

■ Clearly, neither letter states a present intention of Motorola to be bound. The letters evidence the intention of Motorola to contract with the Debtor at some time in the future. A letter of intent does not indicate a present intent to be bound, and thus does not establish the "meeting of the minds" requirement essential to show the formation of a binding contract. *Aces Mechanical Corp.*, 136 A.D.2d at 505, 523 N.Y.S.2d at 827. Furthermore, the letter does not specify any price, and the absence of an essential term, such as price, indicates that the parties intended to engage in further negotiations. *Central Fed. Sav. v. National Westminster Bank, U.S.A.*, 176 A.D.2d 131, 133, 574 N.Y.S.2d 18, 19 (1st Dep't 1991). A party, by simply promising to negotiate, does not incur "any legal detriment which could be considered consideration to support the alleged agreement." *Memorial Assoc. Inc. v. Sunset Memorial Gardens, Inc. (In re Sunset Memorial Gardens, Inc.)*, 49 B.R. 817, 822 (Bankr.D.N.D.1985). Hence, this Court finds that the letters of intent dated September 19, 1988 and October 14, 1988 do not rise to the level of enforceable agreements, no less an executory contract in existence at the time the Debtor filed its petition in bankruptcy.

## 3. The Inspection/Removal Purchase Orders

■ The Debtor asserts that the inspection/removal purchase orders were, in essence, executory contracts that existed at the time it filed its petition. The Debtor claims Motorola's prepetition termination of these alleged executory contracts violated section 365(e)(1) of the Code. However, absent proof of prior oral agreements, these purchase orders did not constitute executory contracts, but rather were mere offers which may be withdrawn prior to acceptance. *See Albrecht Chem. Co. v. Anderson Trading Corp.*, 298 N.Y. 437, 440, 84 N.E.2d 625, 626 (1949) (assuming no prior oral agreement existed, subsequent purchase orders constituted mere offers). As previously discussed, and at very best, the dispute regarding the check mark in the boxes relating to the existence of a prior oral agreement raises a question as to whether the purchase orders were fraudulently altered prior to their submission to this Court. In light of the insufficiency of the evidence presented, this Court refuses to recognize the existence of any individual prior oral agreements relating to the inspection/removal purchase orders as suggested by the Debtor. Hence, the inspection/removal purchase orders, standing alone and pursuant to their very own terms, were mere offers which did not rise to the level of binding executory contracts.

■ Assuming, *arguendo*, that the inspection/removal purchase orders were executory contracts, the Debtor's argument that Motorola's prepetition termination of these purchase orders is a violation of section 365(e)(1) is severely misguided. The alleged executory contracts embodied in the inspection/removal purchase orders were terminated pursuant to a provision on the reverse side of the purchase orders permitting Motorola to "terminate this order ... by giving Seller written notice of its election to do so by mail or telegraph.... In the event of such termination, Motorola agrees to pay Seller ... all costs necessarily incurred by Seller in the performance of this order."

There is no question that section 365(e) renders *ipso facto* [5] clauses invalid in bankruptcy. However, an examination of the pertinent language of section 365(e)(1) clearly indicates that an executory contract of the debtor may not be terminated *after the commencement of a bankruptcy case* solely because of a provision in such contract that is conditioned on the debtor filing a petition in bankruptcy.[6]

 To effectuate the termination of the inspection/removal purchase orders, Motorola delivered a cancellation letter to the Debtor on Friday, March 16, 1990. The Debtor filed its Chapter 11 petition three days later on Monday, March 19, 1990. Thus, the alleged executory contracts were effectively terminated *prepetition.* "[W]here an executory contract has been terminated in accordance with its terms prior to bankruptcy, section 365(e)(1) does not authorize the bankruptcy court to reach beyond the veil of the petition to reinstate the contract." *Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.),* 136 B.R. 636, 639 (Bankr.S.D.N.Y. 1992). Moreover, Motorola, by simply terminating the alleged executory contracts prepetition and pursuant to their general termination clauses, did not breach either agreement. Under New York law, lawful termination of a contract pursuant to an express option contained in it does not constitute a breach. *See Randall v. Michelin Tire Co.,* 137 Misc. 570, 571, 244 N.Y.S. 44, 45 (Sup.Ct. Broome County 1930) (holding termination of contract pursuant to provision indicating "terminable at the option of either party at any time on written notice" effective and non-breach).

4. The Antennae Assembly Purchase Orders

Finally, it is undisputed that Motorola and the Debtor entered into a binding oral contract regarding antennae assemblies which was confirmed via the antennae assembly purchase order. Thus, the parties agree that the antennae assembly purchase order embodied an executory contract in existence at the time the Debtor filed its petition. The oral agreement and purchase order required the Debtor to deliver 100 antennae assemblies on March 12, 1990, and 100 per week thereafter. Motorola sent the Debtor a letter cancelling the antennae assembly purchase order on April 4, 1990, which was over two weeks after the Debtor filed its Chapter 11 petition. The Debtor claims that its rights under section 365(e)(1) were once again violated, but this time by Motorola's *postpetition* termination of an executory contract pursuant to an *ipso facto* clause.

 The Debtor self-servingly fails to indicate, however, that it had already materially breached the contract prepetition. Under New York law, a breach is material if "it is so substantial as to defeat the purpose of the transaction or so severe as to justify the other party's suspension of performance." *Otto Preminger Films, Ltd. v. Qintex Entertainment (In re Qintex Entertainment, Inc.),* 950 F.2d 1492, 1497 (9th Cir.1991) (citing *Lipsky v. Com. United Corp.,* 551 F.2d 887, 895 (2d Cir.1976)). According to the antennae assembly purchase order, the Debtor was to deliver the first 100 antennae assemblies on March 12, 1990, and 100 per week thereafter. The Debtor never delivered the 100 assemblies due on March 12 1990, nor did it ever furnish *any* assemblies to Motorola pursuant to the agreement. At the same time, Motorola, as a subcontractor of the New York City Transit Authority, was obligated to perform its commitments under the time constraints of its contract. The Debtor's failure to deliver the antennae assemblies within the time specified by the antennae assembly purchase order, or make an attempt to cure their default, defeated the purpose of the transaction, and as such is deemed by this Court to be a material breach of contract.

---

**5.** An *ipso facto* clause is an option to terminate a contract conditioned solely on the bankruptcy, insolvency or financial condition of the debtor. This Court notes that it is at best questionable as to whether the general termination clauses on the reverse sides of the purchase orders constituted or were utilized as *ipso facto* clauses because they contain no *ipso facto* language. However, this Court need not reach that issue because the purchase orders were terminated prepetition.

**6.** *See* section 365(e)(1), *supra* note 1.

"A material breach by a party to an executory contract before the bankruptcy of either party gives the other party a unilateral option to either treat his own obligations under the contract as discharged and claim damages for the breach, or to waive the breach and treat the contract as still in effect." Vern Countryman, *Executory Contracts in Bankruptcy: Part II*, 58 Minn. L.Rev. 479, 506 (1974) (citations omitted). Under New York law, "the power to terminate a continuing contract because of a particular breach of that contract is a power of election." *Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir.1969). That court held "[t]he right to terminate in the face of a breach is only an option to declare the contract at an end; if the contract is continued, the party doing so has not, strictly speaking, 'waived' his right but has executed it in favor of continued contractual relations." *Id.* Motorola did not opt to continue its contractual relations with the Debtor pursuant to the antennae assembly purchase order. Instead, Motorola sent the Debtor letter dated April 4, 1990 terminating the antennae assembly purchase order. In effect, Motorola chose to declare the contract at an end. In the absence of any attempt by the Debtor to cure their prepetition default by complying with the requirements of section 365(b)(1), this Court deems Motorola's postpetition termination of antennae assembly contract with the Debtor valid and effective.

This Court well recognizes that "a contract is not deemed terminated and no longer executory simply because the debtor has defaulted or breached the contract before the commencement of a bankruptcy case." *In re RLR Celestial Homes Inc.*, 108 B.R. 36, 45 (Bankr.S.D.N.Y.1989) (citing *Benevides v. Alexander (In re Alexander)*, 670 F.2d 885, 887 (9th Cir.1982). Ruling otherwise would subvert a debtor's explicit license to cure defaults as expressed in 11 U.S.C. § 365(b)(1). *Id.* Thus, Motorola's assertion that the antennae assembly contract was no longer executory after the Debtor's default is hereby rejected. Nevertheless, the Debtor may find little solace in this rejection. Section 365(e)(1) does not apply where, as here, the Debtor materially breached an executory contract prepetition, made no attempt to invoke the provisions of sections 365(a) and (b) to assume, reject or cure its defaults under this contract, and Motorola timely terminated postpetition its contractual relations with the Debtor.

Under the facts of this case, it is this Court's opinion that the essence of Motorola's postpetition termination of the antennae assembly contract stems not from the operation of an *ipso facto* clause regarding the Debtor's filing for bankruptcy, but rather from the Debtor's prepetition material breach with no subsequent attempt to cure any default. Because the Debtor materially breached the antennae assembly contract prepetition and subsequently made no attempt to assume, reject, or cure any default, the Debtor may not belatedly use section 365(e) as a tool to recoup damages resulting from Motorola's valid postpetition termination of that executory contract.

In sum, it is abundantly clear that an "overall agreement" between the Debtor and Motorola was never reached. It is undisputed that throughout the relationship of the parties valid individual agreements were negotiated. Nevertheless, this Court will not legitimize a debtor's last ditch effort to recover damages under section 365(e) by virtue of an adversary proceeding involving agreements that were either effectively terminated prepetition, or terminated postpetition based on the Debtor's prepetition material breach of contract.

## CONCLUSION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1334 and 157(b) as it is a core proceeding.

2. In light of the foregoing, Debtor Plaintiff's Complaint is dismissed.